**UNION PACIFIC RAILROAD COMPANY, et al., Plaintiffs–Appellees,**

v.

**PUBLIC UTILITY COMMISSION OF the STATE OF OREGON; State of Oregon, Defendants–Appellants.**

No. 87–4211.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 2, 1988.

Decided March 28, 1990.

---

Robert M. Atkinson, Asst. Atty. Gen., State of Or., Salem, Or., for defendants-appellants.

Richard G. Smith, and Eugene A. Ritti, Hawley Troxell Ennis & Hawley, Boise, Idaho, for plaintiffs-appellees.

Before BROWNING, TANG and FARRIS, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

The State of Oregon imposes a levy on railroads doing business in Oregon to recoup the costs of regulating railroad operations within that state. *See* Or.Rev.Stat. § 756.310. Union Pacific Railroad Company sought and obtained a declaratory judgment that the levy violates a provision of the Railroad Revitalization and Regulatory Reform Act ("4–R Act") prohibiting the imposition of a "tax that discriminates against a rail carrier." *See* 49 U.S.C. § 11503(b)(4).[1] The only question present-

---

1. 49 U.S.C. § 11503(b) provides:

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation

ed in this appeal is one of statutory interpretation: does § 11503(b)(4) of the 4–R Act prohibit the kind of assessment imposed upon railroads by Or.Rev.Stat. § 756.310?[2] We conclude it does not.[3]

We first consider the nature of the assessment imposed by the Oregon statute; we then summarize the factors from which we conclude Congress did not intend to preclude imposition of such a levy by the State.

I

Oregon Revised Statute § 756.310 is an integral part of a comprehensive scheme, administered by the Oregon Public Utilities Commission, to regulate the business of railroads and other carriers within the State of Oregon. *See id.* § 756.040.

The regulatory scheme includes five distinct programs applicable to railroads. The first relates to safety at railroad crossings. The Commission establishes uniform standards for the location of grade crossings and necessary protective devices. It examines crossings to determine if they are necessary or in need of repair. It may close existing crossings and must approve new ones. The second program regulates the working environment of railroad employees, enforcing state safety standards for track-site walkways, track clearance and water quality and for sanitation facilities in locomotives and cabooses. The Commission's third program involves regulation of transportation of hazardous materials and wastes, principally by maintaining inventories of such materials and requiring notice of their movement. The fourth program relates to enforcement of Federal Rail Safety Program standards. The federal government provides matching funds to encourage state enforcement of such standards; approximately 42 percent of Oregon's program is federally financed. Finally, the Commission administers a "Rates and Service" program to assure "adequate rail services for Oregon rail users at reasonable rates." As part of this program the Commissioner represents Oregon rail users in legal proceedings relating to rail mergers, branch-line abandonments and rate making.

Each year the Commission calculates the fee required to defray the cost of performing the regulatory duties imposed upon it.[4] Each railroad is required to pay the Commission the railroad's proportionate share of the total cost of railroad regulation, subject to a cap of 0.35 percent of the gross operating revenue of railroads operating in Oregon. Or.Rev.Stat. § 756.310(2), (3)(a). The statute stipulates that the fees collected from the railroads by the Commission "shall be used only for the purpose of

---

2. Union Pacific also challenged the Oregon levy under the Due Process, Equal Protection and Commerce Clauses, but the parties agreed to stay further proceedings on the constitutional issues pending decision on whether the 4–R Act covers the challenged assessment.

3. Union Pacific also sought and obtained an injunction against collection of the levy. The Oregon Public Utilities Commission contends the district court did not have jurisdiction to issue such an injunction. Because we hold the levy is not a discriminatory tax within the meaning of § 11503(b)(4), we do not reach the issue of jurisdiction to enjoin collection of a tax that falls within the section.

4. For the year ending June 30, 1987, the Commission's budget for railroad regulation was $1,248,139 allocated approximately as follows:

| | |
|---|---|
| subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title. | |
| Crossing Safety | $ 297,425 |
| Railroad Employee Safety | $ 169,817 |
| Federal Rail Safety Program | 254,115 |
| Railroad Rates and Service | 85,007 |
| Hazardous materials | 17,838 |
| Administration | 83,308 |
| Indirect Costs | 321,605 |
| Revenue Transfer to Oregon Dep't of Transportation for Rail Planning | 19,023 |
| TOTAL | $1,248,139 |

These expenditures were funded from the following sources:

| | |
|---|---|
| Rail Assessment | $ 986,932 |
| Federal Funds: | |
| Track and Equipment | 159,465 |
| Crossing Safety | 12,500 |
| Penalties and Fines | 11,267 |
| Miscellaneous Receipts | 17,712 |
| TOTAL | $1,187,876* |

* The Commission did not explain the $60,000 difference between expenditures and identified sources.

paying the expenses of the commission in respect to railroads." *Id.* § 756.360(1).

In sum, the levy at issue is an integral part of a program to regulate the railroad business in Oregon. It is imposed only upon those who participate in and profit from the business regulated. It is paid directly to the Commission and does not go into Oregon's general fund; it produces no revenues for the general expenses of government but is devoted exclusively to defraying the costs of the regulatory program itself.

## II

### A

Several factors support the conclusion that Congress did not intend section 11503(b)(4) of the 4–R Act to bar assessments of the kind levied by Or.Rev.Stat. § 756.310.

■ Congress passed the 4–R Act "to provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States." *Burlington N. R.R. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 457, 107 S.Ct. 1855, 1857, 95 L.Ed.2d 404 (1987). Section 11503 was included to end discriminatory taxation of railroads by the states. The legislative history reflects Congress's concern that railroads were paying a disproportionate and unfair portion of the cost of state government. *See* H.R.Rep. No. 725, 94th Cong., 1st Sess. 78 (1975) ("railroads are overtaxed by at least $50 million each year"). The railroads actively participated in Congress's study of discriminatory taxation and submitted numerous reports to Congress on the subject during the fifteen years the problem was under consideration. Yet so far as we have been informed or have discovered in our own research, nowhere do these reports or the other legislative materials mention the states' practice of financing railroad regulation through assessments on the railroads, much less suggest that such levies were part of the problem § 11503(b)(4) was enacted to solve.[5]

The omission is significant. Oregon's method of financing state railroad regulatory programs was employed for many years prior to adoption in 1976 of § 11503(b)(4). Oregon initiated its levy in 1908. The State of Washington, amicus curiae, informs us it instituted a similar assessment in 1921, which the Supreme Court sustained against constitutional challenges as early as 1937. *See Great N. Ry. v. Washington,* 300 U.S. 154, 57 S.Ct. 397, 81 L.Ed. 573 (1937). When the 4–R Act was enacted, at least 28 states funded their railroad regulatory programs in part by assessing fees to support regulatory commissions. J. Runke & A. Finder, *State Taxation of Railroads and Tax Relief Programs* app. 2 (1977). An amicus brief filed in the district court by the National Association of Regulatory Utility Commissioners states, without contradiction, that 35 states now fund all or part of their utility and carrier regulatory agencies by fees imposed on the affected industries. *See* NARUC Amicus Brief at 4 (citing NARUC *1984 Annual Report on Utility and Carrier Regulation* 877–78 (1985)).

Not only were such levies widespread and of long standing when the 4–R Act was enacted, but the state regulatory programs they finance are so closely intertwined with federal programs that those concerned with such matters at the national level, in both the legislative and executive branches, could not have been unaware of the levies. *See, e.g.,* 49 C.F.R. Part 212—State Safety Participation Regulations.

It is understandable that neither Congress nor the railroads would consider a levy such as that imposed by Or.Rev.Stat.

---

5. For example, Congress requested the Association of American Railroads "to submit any pertinent information available on relative tax discrimination in the matter of State and local taxes." S.Rep. No. 445, 87th Cong., 1st Sess. 458 (1961), *quoted in Ogilvie v. State Bd. of Equalization,* 657 F.2d 204, 206 (8th Cir.1981). The data submitted in response made no mention of the levies widely imposed to pay the costs of state railroad regulations. *See also* H.R.Rep. No. 725, 94th Cong., 1st Sess. 76–78 (1975); S.Rep. No. 630, 91st Cong., 1st Sess. 2–9 (1969); S.Rep. No. 1483, 90th Cong., 2d Sess. 2–8 (1968).

§ 756.310 to be part of the problem at which the 4–R Act was aimed. Since the Oregon assessment is limited by the cost of the regulatory program, and the revenues raised must be segregated from Oregon's general fund and used only to finance the program, there could be no fear the State would assess Union Pacific unfairly or for the purpose of raising general revenue in violation of the spirit of the 4–R Act.

## B

■ The language of § 11503(b)(4), read in light of its legislative history and the definition of the term "tax" by the courts, supports the conclusion that Congress did not intend that a levy of the kind imposed by the Oregon statute be included in and thus barred by the section.

Many years before Congress enacted § 11503, the Supreme Court held in *Head Money Cases (Edye v. Robertson)*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884), that assessments of the kind imposed by Or. Rev.Stat. § 756.310 are not "taxes" within the meaning of the constitutional grant of taxing power to Congress. The Court looked both to the primary purpose of the contested levy and the primary purpose of the provision it was said to violate.[6]

The *Head Money Cases* involved a provision in "An Act to Regulate Immigration" that required ship owners to pay a levy of 50¢ for each passenger, not a citizen, entering the United States from a foreign port. *Id.* at 589–90, 5 S.Ct. at 249–50. The proceeds were deposited in a special fund to be used " 'to defray the expense of regulating immigration under this act, and for the care of immigrants arriving in the United States, for the relief of such as are in distress, and for the general purposes and expenses of carrying this act into effect.' " *Id.* at 590, 5 S.Ct. at 249 (quoting 22 Stat. 214).

The ship owners contended this provision violated article I, section 8 of the Constitution, which empowers Congress to lay and collect "Taxes, Duties, Imposts and Excises," because the provision did not "provide for the common defence and general welfare of the United States" and was not "uniform throughout the United States." *Head Money Cases*, 112 U.S. at 594, 5 S.Ct. at 251. "[T]he true answer to all these objections," the Court responded, "is that the power exercised in this instance is not the taxing power." *Id.* at 595, 5 S.Ct. at 252. The levy, the Court held, was not a tax, but "the mere incident of the regulation of commerce." *Id.*

The Court pointed out that the purpose of the Act was to regulate immigration and mitigate the evils incident to the business of bringing newcomers to this country; the assessment was merely a means of requiring those who profited from this business to pay the costs of regulating it. The money paid was not, "strictly speaking, a tax or duty within the meaning of the Constitution." *Id.* at 595–96, 5 S.Ct. at 252–53.

> The money thus raised … is appropriated in advance to the uses of the statute, and does not go to the general support of the government. It constitutes a fund raised from those who are engaged in the transportation of these passengers, and who make a profit out of it, for the temporary care of the passengers whom they bring among us and for the protection of the citizens among whom they are landed.

*Id.* at 596, 5 S.Ct. at 252. The Court concluded, "[i]f this is an expedient regulation of commerce by Congress, and the end to be attained is one falling within that power, the act is not void, because, within a loose and more extended sense than was used in the Constitution, it is called a tax." *Id.*

Subsequent cases have held in a variety of contexts that government levies did not constitute "taxes" in light of the nature of the levy and the purpose of the pertinent constitutional or statutory provision. For example, the Fourth Circuit in *South Carolina ex rel. Tindal v. Block*, 717 F.2d 874 (4th Cir.1983), followed the rationale of the

6. As the court of appeals said in *Brock v. Washington Metro. Area Transit Auth.*, 796 F.2d 481, 489 (D.C.Cir.1986), "[t]he definition of 'tax' in the abstract is a metaphysical exercise in which courts do not have occasion to engage. The term comes before judges embedded in legal contexts from which the word gains concrete and specific meaning."

*Head Money Cases* in holding that the concerns underlying the constitutional limitations imposed on the taxing power by article I, section 8 are relevant to measures having the primary objective of raising revenues for the general support of government, but not to measures having the primary objective of regulating commerce. Thus, a levy to collect the costs of regulation from those regulated is not to be treated as a tax to which the limitations of article I, section 8 apply. *Id.* at 887; *see also United States v. Stangland*, 242 F.2d 843, 848 (7th Cir.1957); *Rodgers v. United States*, 138 F.2d 992, 994–95 (6th Cir.1943).[7]

In *Brock v. Washington Metropolitan Area Transit Authority*, 796 F.2d 481 (D.C.Cir.1986), the Transit Authority challenged a workers' compensation assessment, claiming the assessment violated the provision of an interstate compact, approved by Congress, granting the Transit Authority immunity from "taxes or assessments." *Id.* at 487.[8] The D.C. Circuit Court of Appeals rejected this argument. The court first looked to the purpose of the Transit Authority's tax immunity, and concluded that treating the employer's contribution to the workers' compensation fund as one of the "taxes or assessments" barred by the compact would not serve that purpose. *Id.* at 487–89. The court reasoned that the purpose of the immunity was to avoid having the Transit Authority contribute money to general revenues that would then be returned to the Authority to finance its operations.

This rationale suggested "that a levy is properly defined as a 'tax' within the meaning of the WMATA Compact provision when its principal purpose is to raise revenues, not to regulate activities." *Id.* at

488. Relying upon the reasoning in *Head Money Cases, Block, Stangland* and *Rodgers*, the court held that because the primary purpose of the workers' compensation act was the regulation of liability for industrial accidents, not the raising of revenue, the levy was not a tax within the meaning of the compact. *Id.* at 489.

In light of these cases and the legislative history of § 11503, we conclude Congress did not intend the term "tax" in § 11503(b)(4) of the 4–R Act to bar the levy imposed by Or.Rev.Stat. § 756.310. The Oregon levy is designed to recoup the costs of a regulatory program from members of the industry regulated, rather than to raise general revenues,[9] and excluding such a levy from the bar against discriminatory taxes is consistent with the purposes of § 11503(b)(4).

### III

■ Union Pacific's principal argument in support of the contrary position is that the assessment authorized by Or.Rev.Stat. § 756.310 is a "tax" within the meaning of 49 U.S.C. § 11503 because it does not have the characteristics of a "fee" as defined in *National Cable Television Ass'n v. United States*, 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), and *Federal Power Comm'n v. New England Power Co.*, 415 U.S. 345, 94 S.Ct. 1151, 39 L.Ed.2d 383 (1974). In those cases, the Supreme Court defined a fee as a payment made in connection with a voluntary application to a public agency for a grant bestowing a benefit on the applicant not shared by other members of society. *National Cable*, 415 U.S. at

---

7. Similarly, we held in *Moon v. Freeman*, 379 F.2d 382, 390–92 (9th Cir.1967), that a charge imposed on farmers as a condition to exporting grain did not violate the prohibition in article I, section 9, clause 5 of a "tax or duty" on exports. The primary purpose of the charge was not to raise revenue by taxing exports, but rather to recover from farmers a part of the cost of a program to regulate farm production.

8. The Transit Authority also challenged the assessment on the ground it violated the "doctrine of intergovernmental tax immunity." The court found the assessment was a user fee for purposes of that doctrine. *Brock*, 796 F.2d at 484–

487; *see Massachusetts v. United States*, 435 U.S. 444, 465–69, 98 S.Ct. 1153, 1166–68, 55 L.Ed.2d 403 (1978).

9. Union Pacific argues that a distinction should be taken between a levy intended to implement a regulatory program directly by altering the conduct of the payer and one intended simply to pay the cost of the regulatory program: that the latter is indistinguishable from any other tax to raise revenue to pay the cost of government operations. *Union Pacific* has cited no decision resting upon this distinction, and it is clearly inconsistent with the holding in *Head Money Cases*.

340–41, 94 S.Ct. at 1148–49; *New England Power*, 415 U.S. at 349–50, 94 S.Ct. at 1154. Union Pacific argues that because the levy imposed by Or.Rev.Stat. § 756.310 is obligatory rather than voluntary and the benefits of the regulatory program financed by the levy inure primarily to the public rather than to Union Pacific, the levy cannot be a "fee" under this definition and must be a tax.

*National Cable* and *New England Power*, like this case, were concerned with the interpretation of a statute. At issue was the meaning of "fee, charge, or price" in a provision of the Independent Offices Appropriation Act of 1952, 31 U.S.C. § 483a (revised and recodified at 31 U.S.C. § 9701), directing federal agencies to collect a "fee, charge, or price" for any "work, service, ... benefit, ... license, ... or similar thing of value ... granted, prepared, or issued by any Federal agency." The Court held that under the statute the agency could charge fee payers no more than the value of the service or benefit provided to them by the agency.

This interpretation of the Independent Offices Appropriation Act was dictated by the purpose, language and legislative history of the Act. The term "fee" was coupled in the statute with the words "charge or price," both suggesting a quid pro quo. The "fee" was to cover the cost of "any work, service, ... benefit, ... or similar thing of value or utility performed, furnished, provided [or] granted ... by any Federal agency ... to or for any person," language having the same connotation. One of the factors the statute expressly required the agency to consider in fixing the fee was "value to the recipient." 31 U.S.C. § 483a. The "philosophy" of the statute, the Court noted, was that the "fee" it authorized was "fair" because it was "in exchange for the franchise that the Government gives the broadcasting company and the protection which the Government affords to such broadcasting company to assure its freedom from interference" with its broadcast signal. *National Cable*, 415 U.S. at 343, 94 S.Ct. at 1150 (quoting Congressman Yates, 97 Cong.Rec.

4809). Congress's underlying concern was "that the Government is not receiving full return from many of the services which it renders to *special beneficiaries*." *New England Power*, 415 U.S. at 349, 94 S.Ct. at 1154 (quoting H.R.Rep. No. 384, 82 Cong., 1st Sess. 2 (1951)) (emphasis added by the Court). The Court noted that a circular construing the Independent Offices Appropriation Act issued by the Office of Management and Budget states

> a reasonable charge "should be made to each *identifiable recipient* for a measurable unit or amount of Government service or property from which he derives a special benefit." The circular also states that no charge should be made for services rendered, "when the identification of the ultimate beneficiary is obscure and the service can be primarily considered as benefitting broadly the general public."

*Id.* at 349–50, 94 S.Ct. at 1154 (quoting Budget Circular No. A–25, Sept. 23, 1959) (emphasis added by the Court).

These indicia of legislative intent strongly supported the Court's conclusion that Congress intended the term "fee" in 31 U.S.C. § 483a to include only charges that approximated the value of the property or service received by the fee payer from the agency. *See also* S.Rep. No. 2120, 81st Cong., 2d Sess. 1 (1950). As we have seen, there are equally strong reasons for concluding Congress did not intend to include in the term "tax" in § 11503(b)(4) charges imposed upon members of an industry to recoup the cost of regulating that industry, even though the regulatory program is principally intended to and does benefit the general public rather than industry members.

To add support to its narrow construction of the term "fee" as used in 31 U.S.C. § 483a, the Court in *National Cable* and *New England Power* referred to a possible constitutional problem that might arise if the statute were construed as delegating Congress's taxing power to an executive agency. *See* 415 U.S. at 340, 342, 351, 94 S.Ct. at 1148, 1149, 1155.[10] Union Pacific

---

**10.** It should be emphasized that there is no potential constitutional issue in this case that could be avoided by reading the term "tax" in § 11503(b)(4) of the 4–R Act to include, and hence bar, a levy of the kind imposed by Or. Rev.Stat. § 756.310.

argues, in effect, that these portions of the opinions establish rigid, mutually exclusive and universally applicable definitions of the terms "fee" and "tax" that preclude reading the term "tax" in § 11503(b)(4) of the 4–R Act (or presumably, any other statute and apparently, regardless of legislative intent) as excluding an assessment levied for public purposes rather than as payment for services or property received by the payer from the government.

This position is untenable. The *Head Money Cases* are precisely in point. A levy to defray the cost of regulation in the public interest rather than to pay for service or property provided by the government was held not to be a tax within the meaning of that term in article 1, section 8.[11] Union Pacific does not attempt to distinguish the *Head Money Cases*, but simply observes they were "decided well before the two 1974 Supreme Court cases, *National Cable* and *New England Power*." The Supreme Court did not mention the *Head Money Cases* in *National Cable* and *New England Power*, no doubt because the Court recognized that it was not announcing universal definitions of "tax" and "fee" in the two later decisions but simply determining the meaning of these terms in a particular context quite different from that presented in the *Head Money Cases*.

Union Pacific also relies upon cases interpreting the term "tax" for purposes of provisions of the Bankruptcy Act limiting the effect of a discharge on release of taxes, 11 U.S.C. § 35(a)(1) (1976);[12] and according priority in payment to claims for unpaid taxes, 11 U.S.C. § 104(a)(4) (1976).[13] We note in response the *Brock* court's comment that "the characterization of a pay-

ment as a 'tax' in certain contexts has no 'talismanic significance.' " *Brock*, 796 F.2d at 487 n. 10 (quoting *Massachusetts v. United States*, 435 U.S. at 460 n. 18, 98 S.Ct. at 1164 n. 18). This is particularly true when the term is used in the context of an elaborate statutory scheme such as that created by the Bankruptcy Act. *See id.*[14]

## IV

Because we conclude Congress did not intend § 11503(b)(4) of the 4–R Act to bar a levy of the kind imposed by Or.Rev.Stat. § 756.310, the judgment is REVERSED and the cause REMANDED for further proceedings.

---

11. *See Brock*, 796 F.2d 481; *Block*, 717 F.2d 874; *Moon*, 379 F.2d 382; *Stangland*, 242 F.2d 843; *Rodgers*, 138 F.2d 992.

   Unless voluntary is defined so broadly as to be essentially meaningless, all of these decisions are also inconsistent with Union Pacific's contention that a levy cannot be classified as a "fee" rather than a "tax" if payment is obligatory rather than the consequence of a voluntary act. *See also United States v. Sperry Corp.*, —— U.S. ——, 110 S.Ct. 387, 395, 107 L.Ed.2d 290 (1989).

12. *See, e.g., United States v. River Coal Co.*, 748 F.2d 1103 (6th Cir.1984).

13. *See, e.g., In re Lorber Indus.*, 675 F.2d 1062 (9th Cir.1982); *Dungan v. Department of Agriculture*, 332 F.2d 793 (9th Cir.1964).

14. *Compare, e.g., id.* at 484 (contribution to workers' compensation scheme properly characterized as a *regulatory levy, not a tax*, for purposes of statutory tax immunity) *with In re Pan Am. Paper Mills*, 618 F.2d 159, 162 (1st Cir.1980) (workers' compensation "premium" is a "tax" for priority purposes under the Bankruptcy Act).