Maraia et al v. City of Cranston, RI  98-CV-173-B   03/29/99

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Joseph Maraia, et. al.</u>

   v.                                   N.H. Civil No. 98-CV-173-B
                                         R.I. Civil No. 98-CV-25
<u>The City of Cranston, et. al.</u>


<u>**MEMORANDUM AND ORDER**</u>


The plaintiffs in this class action pay sewer assessments to the City of Cranston, Rhode Island.  Their complaint against the city and several of its officials concerns the city's agreement to lease its sewer system to a private corporation in exchange for a $48 million loan and other consideration.  This lease agreement obligates the city's sewer fee payers to repay the loan and compensate the private corporation for operating and maintaining the sewer system.

Plaintiffs initially filed their complaint in state court. They allege that the city is violating state law by using some proceeds of the loan to pay debts unrelated to the operation of the sewer system.  They also claim that the city violated state and federal law by entering into the lease agreement and accepting the loan without first holding a city-wide vote.  Among other forms of relief, plaintiffs seek an injunction barring the City Council from raising sewer assessments to repay the allegedly illegal loan.  Defendants removed the case to federal

court relying on the fact that the complaint contains claims based on federal law.  See 28 U.S.C.A. § 1441(b) (West 1994).  Plaintiffs now seek to have the case remanded on the ground that the Tax Injunction Act ("TIA"), 28 U.S.C.A. § 1341 (West 1994), deprives the court of subject matter jurisdiction.

## II.    BACKGROUND

Cranston operates its city-wide sewer system pursuant to a grant of authority from the Rhode Island General Assembly.  See P.L. 1939, Chapter 750, An Act to Create A Sewer Commission For the City of Cranston and to Authorize Said City to Construct and Maintain a Sewer System as amended by Chapter 1372 of the Public Law, 1943, and by Chapter 1891, P.L. 1947.  Approximately 92 percent of the City's residences and virtually all of its public business and industrial facilities are connected to the system.[1] A city ordinance requires that any residence or business whose property is located within 100 feet of a sewer line must be connected to the sewer system.  See Cranston City Code, Art. II, Sec. 26-8.

All cities and towns in Rhode Island are authorized to enact ordinances imposing sewer assessments.  See R.I. Gen. L. § 45-14-

---

[1]  A few residences in the city have septic systems and a small section of the city is served by the City of Warwick's sewer system.  See Pl. Ex. A, Rhode Island Clean Water Finance Agency Preliminary Official Statement of Aug. 22, 1997, at 30.

1. Cranston funds the cost of operating its sewer system though annual charges that vary depending upon the type of user. Residential users and buildings containing clubs, libraries and hospitals are charged a flat fee per unit. The assessment for business users is based upon the number of employees. The assessment for restaurants and clubs is based upon seating capacity and the charge for laundries is based upon the number of washing units. Public buildings are assessed based on the number of fixtures located in the building. Industrial users are assessed a minimum charge based upon the number of employees and an additional charge based upon the user's sewage flow rate and the nature of the pollutants contained in its waste stream. Non-users whose properties abut a sewer line are also charged a flat fee. See Cranston City Code, Article VI, Sec. 26-71.

On March 7, 1997, Cranston entered into an agreement to lease its sewer system to Triton Ocean State LLC, a private corporation. In exchange for the city's agreement to make monetary payments to Triton during the agreement's 25-year term, Triton agreed to (1) operate, repair and maintain the sewer system; (2) finance and make certain capital improvements to the system; and (3) pay the city $48 million at the commencement of the contract. The city has agreed to fund its obligations under the lease agreement with the proceeds of its annual sewer

assessments.

## II.  **DISCUSSION**

The Tax Injunction Act provides, in pertinent part, that "district courts shall not enjoin, suspend, or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  The Court has established that the policy rationale underlying the TIA bars declaratory, injunctive, and monetary relief, see National Private Truck Council, Inc. v. Oklahoma Tax Comm'n, 515 U.S. 582, 586-87 (1995); California v. Grace Brethren Church, 457 U.S. 393, 411 (1982), and that actions which would enjoin the collection of local taxes are within the reach of the statute.  See Collins Holding Corp. v. Jasper County, South Carolina, 123 F.3d 797, 799 n. 1 (4th Cir. 1997).  The TIA is a complete bar to federal jurisdiction.  It is not subject to waiver, and, if applicable, will require the remand of this case to the Rhode Island state courts.  See Cumberland Farms, Inc. v. Tax Assessor, State of Maine, 116 F.3d 943, 945 (1st Cir. 1997); Bank of New England Old Colony, N.A. v. Clark, 986 F.2d 600, 604 (1st Cir. 1993) (affirming remand of case due to applicability of TIA).

Two conditions must be satisfied for the TIA to deprive a

-4-

federal court of subject matter jurisdiction: (1) the challenged claim must seek to "enjoin, suspend or restrain the assessment, levy, or collection of a tax" and (2) the state courts must furnish a "plain, speedy, and efficient remedy" for the alleged violation. 28 U.S.C. § 1341. See also Cumberland Farms, 116 F.3d at 945. I examine the applicability of each condition in turn.

### A. Is the Cranston Sewer Assessment a Tax?

#### 1. Purpose of the Tax Injunction Act

The deference which the TIA requires federal courts to pay to state and local governments in their collection of revenue is premised on the principle of federalism. The Act reflects the "scrupulous regard for the rightful independence of state governments . . . and a proper reluctance to interfere by injunction with their fiscal operations." Hillsborough v. Cromwell, 326 U.S. 620, 622 (1946); see also Tully v. Griffin, 429 U.S. 68, 73 (1976) (noting the Act's purpose of recognizing "the imperative need of a State to administer its own fiscal operations"). Essentially, "the Act . . . [is] first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 522 (1981). "By closing the federal courthouse door to

taxpayer claims, Congress sought to end this burdensome disruption of local financing." Tramel v. Schrader, 505 F.2d 1310, 1316 (5th Cir. 1975).

## 2. Tax-versus-fee analysis

Although the Supreme Court has not identified the factors that a court should consider in determining whether a state or local assessment qualifies as a "tax" for purposes of the TIA, it has differentiated between a "tax" and a "fee" in other situations. In its analysis of FCC fees challenged as taxes, for example, the court stated,

> Taxation is a legislative function . . . A fee, however, is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station. The public agency performing the services normally may exact a fee for a grant which, presumably, bestows a benefit on the applicant not shared by other members of society.

National Cable Television Ass'n v. United States, 415 U.S. 336, 340-41 (1974).

The First Circuit has directly addressed the distinction between taxes and regulatory fees under the TIA in San Juan Cellular Tel. Co. v. Public Serv. Comm'n, 967 F.2d 683 (1st Cir. 1992) and two subsequent cases. In San Juan Cellular, after a survey of applicable case law, the court stated that

> Courts have had to distinguish "taxes" from regulatory "fees" in a variety of statutory contexts. Yet in doing so, they have analyzed the legal issues in

similar ways.  They have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic fee at the other.  The classic "tax" is imposed by a legislature upon many, or all, citizens.  It raises money, contributed to a general fund, and spent for the benefit of the entire community.  The classic "regulatory fee" is imposed by an agency upon those subject to its regulation.  It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive.  Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses.

Courts facing cases that lie near the middle of this spectrum have tended . . . to emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation.

Id. at 685 (internal citations omitted).  In San Juan Cellular, the Court held that the "periodic fee" imposed by the Puerto Rico Public Service Commission ("PSC") on a private firm, which the firm's government-owned competitor was not obligated to pay, was a "regulatory fee" rather than a tax.  See San Juan Cellular, 967 F.2d at 686.  The Court pointed to three factors that made the PSC impost more like a fee than a tax: (1) that a regulatory agency assessed the fee; (2) that the agency put the money in a special, segregated fund; and (3) that the money was used to defray expenses generated by specialized, Commission-related investigations and studies, for the hiring of service-related professionals, and for the acquisition of equipment needed for

the operation of the cellular service.  See id.

In Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1 (1st Cir. 1992), the Court stressed many of the same factors it cited in San Juan Cellular.  The Court noted, however, that

> "[t]he most common formula for classifying exactions under the Tax Injunction Act - asking whether the payment is a tax to raise general revenue or is a fee incident to regulation . . . does not provide much help in this case . . . [because] the purpose of the fee here . . . is neither to raise general revenue . . . nor to regulate conduct . . . ."

Id. at 5.  Nevertheless, the court found the Puerto Rican Automobile Accident Compensation Administration's ("AACA") special assessment on van trailer vehicles used in maritime transportation was more a "fee" than a "tax," noting that the balance of the applicable factors weighed in favor of finding a fee, including:

> (1) the fact that the fees paid are held separately from general state funds . . . (2) dedicated exclusively to reimburse private parties and to cover AACA's administrative expenses . . . (3) collected only from those seeking the privilege of driving on state highways . . . [and] (4) proportioned (for motor vehicles as a class) to compensate victims for specified damage resulting from that activity . . . .

Id. at 6.

Finally, in Cumberland Farms, the Court adhered to and fleshed out its analysis in San Juan Cellular.  In finding that

-8-

Maine's milk handling surcharge was a tax rather than a fee, the Court cited a number of factors including: (1) that the surcharge was imposed by the state legislature rather than by an administrative agency; (2) that the revenues raised were deposited into Maine's general fund and spent for the benefit of the citizenry as a whole; (3) that the stated purpose of the surcharge was to raise general revenue for the state; (4) that the Maine legislature consistently referred to the surcharge as a "tax" throughout the body of the Act which imposed the charge; and (5) that the responsibility for administering the statute was assigned to the State Tax Assessor. See Cumberland Farms, 116 F.3d at 946. Although the Court recognized that several other relevant factors supported the contrary conclusion, including the fact that the surcharge furthered a regulatory purpose and was imposed only on milk handlers and not the general citizenry, the Court noted that

> the characterization of a governmental assessment as a tax or a fee is rarely a choice between black and white. Many imposts fall into the gray area in the center of the spectrum . . . [when] the question is close . . . [a]s San Juan Cellular suggests, the most salient factor in the decisional mix concerns the destination of the revenues raised by the impost - and here, the revenues go into Maine's general fund. Although this element alone is not always decisive, it is particularly important where, as here, the stated purpose of the impost is to garner revenue.

Id. at 946-47.

-9-

In summary, the First Circuit's decisions in <u>San Juan Cellular</u>, <u>Marine Transport</u>, and <u>Cumberland Farms</u> demonstrate that several factors potentially drive the tax-versus-fee analysis in any given case, including: (1) the source of the impost; (2) whether the revenue raised by the impost is deposited into a segregated fund; (3) whether the purpose of the impost is primarily to raise general revenue or to regulate conduct; (4) the ultimate use of the revenue collected; (5) whether the use to which the revenue is put confers a benefit on the general public; (6) how the state legislature refers to the impost in the enabling legislation; and (7) who was assigned the responsibility for administering the statute.

Decisions in other circuits have also identified other relevant criteria demarcating the boundaries between taxes and regulatory fees under the TIA. <u>See</u> <u>Schneider Transport, Inc. v. Cattanach</u>, 657 F.2d 128, 132 (7th Cir. 1981)(finding a Wisconsin Department of Transportation charge upon trucks a "tax," because the charge was used to fund highway construction - a "general" public expenditure); <u>Keleher v. New England Tel. & Tel. Co.</u>, 947 F.2d 547, 549 (2d Cir. 1991)(finding a city-assessed public utility franchise fee a "tax" because the funds raised were treated as part of the city's "general revenue"); <u>Union Pacific Railroad Co. v. Public Utility Comm'n</u>, 899 F.2d 854, 856 (9th

-10-

Cir. 1990)(holding that Public Utility Commission's assessment was a "fee" because it "defray[ed] the cost of performing the regulatory duties imposed" on the Commission); <u>Mississippi Power & Light Co. v. U.S. Nuclear Regulatory Commission</u>, 601 F.2d 223, 228, 231-32 (5th Cir. 1979)(holding that a Nuclear Regulatory Commission's charge was a "fee" because its proceeds helped defray costs of regulatory duties including "environmental reviews," "uncontested hearings," and "administrative and technical support" for licensing procedures); <u>Tindal v. Block</u>, 717 F.2d 874, 887 (4th Cir. 1983)(finding that a charge on milk sales was a "fee" because the proceeds partially funded a milk price-support program). To the extent that these decisions identify factors that are relevant in the context of the present case, I also apply them in determining whether Cranston's sewer assessment should be treated as a tax for purposes of the TIA in the context of the present case.

### 3. Analysis of the case at bar

Although the First Circuit and other appellate courts have identified a number of factors that may be relevant in distinguishing taxes from fees under the TIA, I do not construe these precedents to require the mechanical application of each factor in every case. See <u>Trailer Marine Transport</u>, 977 F.2d at 5. ("[t]he most common formula for classifying exactions under the

-11-

Tax Injunction Act . . . is often useful but does not provide much help in this case"). The First Circuit has not yet considered a case factually comparable to the one at bar - where the impost in question affects nearly the entire population of the governmental unit imposing the assessment, and where the assessment concerns a core governmental function vital to the continuing health and welfare of all city residents. Because the facts of this case do not readily conform to rote analysis, a broader evaluation is warranted - one which examines the policy underpinnings of the TIA as well as the factors the First Circuit counsels me to consider.

Three related factors are of primary importance in this case and lead me to conclude that Cranston's sewer assessment should be viewed as a tax rather than a fee. The first is that the assessment is intended to finance a vital government service that benefits the entire community. Governments have provided sewer systems for their citizens for thousands of years and the public need for community-based sewage systems has grown over time as the amount and toxicity of sewerage has increased.[2] Accordingly,

_____

[2] See "Sewage System." Britannica CD. Version 97. Encyclopaedia Britannica, Inc., 1997 (noting that "[t]he Romans, especially, constructed elaborate systems" to handle storm runoff and drain wastewater from the public baths, and that, "as the correlation between sewage and disease became apparent in the mid-19th century," with increased population concentrations and the addition of manufacturing waste to sewage runoff during the

the provision of sewer services is widely perceived to be a core function of local government similar to fire and police protection, snow removal, street repair and other municipal services that benefit the entire community and are commonly funded by local taxes.

The second factor that influences my analysis is that Cranston's sewer assessment affects virtually all of the owners of developed property in the city, rather than a narrow subset of citizens who are subjected to the assessment because they elected to participate in an activity subject to government regulation. As I have previously noted, virtually all owners of developed property in the city must be connected to the system and must pay an annual sewer assessment. See supra text at pp. 2-3. Even those few property owners who do not use the sewer system are required to pay an assessment if their property abuts an existing sewer line. See Cranston City Code, Art. XI, Sec. 26-71(h) (establishing an annual charge of $70.91 for properties which abut the sewer line but have not connected, to be used "to recover costs of sewer system capital improvements"). In this sense, the assessment is quite different from other exactions, designed to fund the cost of regulation through an assessment

---

Industrial Revolution, increased steps were taken to treat wastewater).

targeted at a narrow subset of citizens, which the First Circuit has held to be fees.  See, e.g., San Juan Cellular, 967 F.2d at 686; Trailer Marine Transport Corp., 977 F.2d at 6.

Finally, it is clear from the record that a significant proportion of the proceeds generated by the lease loan has been intermingled with the City of Cranston's General Fund.[3]  See e.g., Affidavit of Stephen Woerner, Finance Director of the City of Cranston, at ¶ 3 (noting that "$6,871,671 was applied to reduce General Fund cumulative deficits"; "$6,129,682 was used to establish a General Fund working capital balance"; $5,075,000 was still invested and being held in a "Special Infrastructure Fund" with an intended use that had "not yet been determined"; and $3,400,000 was used to repay the debt of the independent Water Fund).  In sum, more than $16.4 million, or 41 percent, of the original $40 million lease loan has been transferred to the City of Cranston's General Fund for non-sewer related uses.  This considerable intermingling of proceeds from the lease loan with

_____

[3]  The accounting methods employed by the City of Cranston, as displayed in the record, reveal considerable intermingling of funds and less-than-adequate record keeping.  See Dep. of Woerner at 44 ("prior to my coming on January 20, there had been approximately a nine-month gap where they really didn't have a full-time finance director . . . the acting finance director . . . didn't have an accounting background . . . they haven't made all the correct entries . . ."). See generally, Pl. Ex. F at 75-79 (City of Cranston Rhode Island Enterprise Fund Balance Sheet for year ending June 30, 1997).

the City of Cranston's General Fund, and the use of these proceeds for non-sewer-related expenditures lends further support to my conclusion that the City of Cranston's sewer assessments that will be recovered to repay this lease loan are more properly characterized as a "tax" than a "fee." See e.g., Cumberland Farms, 116 F.3d at 946 (when "the question is close . . . the most salient factor . . . concerns the distribution of the revenues raised by the impost . . . it is particularly important where, as here, the stated purpose of the impost is to garner revenue . . .").

As I have previously noted, the Tax Injunction Act was intended to insulate the fiscal operations of state and local governments from interference by the federal courts. See, e.g., Hillsborough v. Cromwell, 326 U.S. at 622. Since Cranston's sewer assessment was intended to raise revenue to support a core governmental function, the assessment applies broadly to virtually all of the city's property owners, and there has been significant intermingling of the sewer lease loan proceeds with the City of Cranston's General Fund, it would contravene the purposes of the TIA to treat the subsequent sewer assessments used to pay off this loan as a "fee" rather than a "tax." This conclusion is consistent with the rulings of other federal courts that have treated sewer assessments as taxes for purposes of the

TIA.  See Kerns v. Dukes, 153 F.3d 96, 102 (3d Cir. 1998)(noting that an assessment to fund a new sewer district was a tax); Burris v. City of Little Rock, 941 F.2d 717, 721 (8th Cir. 1991)(finding assessment to pay for sewer improvements was a tax); Carson v. City of Fort Lauderdale, 293 F.2d 337, 339 (5th Cir. 1961)(same); Group Assisting Sewer Proposal-Ansonia v. City of Ansonia, 448 F. Supp. 45, 46 (D. Conn. 1978)(same).

Defendants offer two arguments to support their assertion that Cranston's sewer assessment is not a tax.  First, they allege that proceeds generated by the assessment are paid into a separate "Sewer Enterprise Fund" rather than the city's general fund, and that this fact distinguishes the sewer assessment from other city taxes which ordinarily are paid into the general fund. As I have already illustrated, the significant intermingling of the lease loan proceeds with the City of Cranston's General Fund and their expenditure for non-sewer-related purposes makes this argument untenable.  In any event, as the Sixth Circuit recently held, relying in part upon guidelines established in San Juan Cellular, where an assessment is placed in a fund that, although segregated from the general fund, serves public purposes benefitting the entire community, the assessment is properly viewed as a tax under the TIA.  See American Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Management District,

1999 WL 33238 (6th Cir., Jan. 28, 1999). According to the court, such assessments,

> "relate directly to the general welfare of the citizens . . . and dedication [of the imposts] to a particular aspect of state welfare makes them no less general revenue raising levies . . . the revenue's ultimate use as a benefit shared by the public and not just the waste disposal facilities indicates that the assessment here is a tax."

Id. Such is the case here.

Defendants' second argument is that the city's sewer assessment must be treated as a fee rather than a tax because the Rhode Island Supreme Court has ruled that sewer assessments are not to be considered a tax under state law. The Rhode Island General Assembly has authorized city and town councils to impose sewer assessments by enacting ordinances rather than putting such assessments to a vote of the citizenry. See R.I. Gen. L. § 45-14-1. In contrast, it has elsewhere specified that a local "tax" may only be approved by a town if special notice of the proposed tax is provided to the citizens and the tax is later approved at a town meeting. See R.I. Gen. L. § 45-3-12. In Costello v. Ricci, 401 A.2d 38 (R.I. 1979), the Rhode Island Supreme Court ruled that a sewer assessment is not subject to the special notice and voter approval requirements that apply to local taxes because sewer assessments are authorized by a separate statute that does not impose such requirements. Id. at 40. Defendants

-17-

argue that this decision requires a comparable conclusion under the TIA. I disagree.

While state court evaluations of whether an assessment should be treated as a tax under state law can be helpful in guiding an analysis of the issue under the TIA, broad pronouncements by state courts labeling certain assessments as taxes or fees are not dispositive. See Folio v. Clarksburg, West Virginia, 134 F.3d 1211, 1217 (4th Cir. 1998); Robinson Protective Alarm Co. v. City of Philadelphia, 581 F.2d 371, 374 (3d Cir. 1978); Collins Holding Corp., 123 F.3d at 800 n. 3. This is so because the label chosen by the state in a different context will not necessarily be consistent with the conclusions reached by a federal court applying the analysis required by the Tax Injunction Act. See Collins Holding Corp., 123 F.3d at 800 n.3.

In Costello, the Rhode Island Supreme Court did not need to consider any of the factors that affect the resolution of the tax or fee question under the TIA. Instead, to reach its conclusion, the court merely had to acknowledge that the Rhode Island General Assembly had enacted specific laws governing sewer assessments that did not require such assessments to be placed before the voters for approval before they could become effective. As such, its decision is of limited value in resolving the more nuanced

-18-

question presented here. Accordingly, Cranston's sewer assessment is properly considered a tax under the TIA.

B.  **The Rhode Island State Courts Provide an Adequate State Remedy**

Even if, as here, an assessment should be treated as a tax for purposes of the TIA, the Act will not divest the federal courts of subject matter jurisdiction over a dispute involving the tax unless the state court to which the dispute is to be remanded is equipped to furnish the plaintiffs with a "plain, speedy, and efficient" remedy. Cumberland Farms, Inc., 116 F.3d at 945; see also Home Builders Ass'n of Mississippi, Inc. v. City of Madison, Mississippi, 143 F.3d 1006, 1009 (5th Cir. 1998); Home Builders Ass'n, 143 F.3d at 1009. In evaluating the adequacy of state court remedies, the Fifth Circuit has observed:

> State courts are equipped to furnish a plain, speedy, and efficient remedy if they provide a procedural vehicle that affords taxpayers the opportunity to raise their federal constitutional claims. That is, a state's remedy is adequate when it provides taxpayers with a complete judicial determination that is ultimately reviewable in the United States Supreme Court.

Id. at 1012. I apply this standard in evaluating the adequacy of state court remedies in the present case.

Prior to its removal by the defendants pursuant to 28 U.S.C. § 1441 et seq., this case was filed in Rhode Island superior court. In their complaint, plaintiffs noted the propriety of the

-19-

superior court's jurisdiction pursuant to R.I.G.L. § 9-30-1 (Uniform Declaratory Judgment Act); § 8-2-13 (exclusive jurisdiction over equity actions); § 8-2-14 (original jurisdiction over all actions at law where some right or interest in real estate is in issue), and pursuant to its concurrent jurisdiction over claims brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  In their Answer, defendants did not challenge the propriety of superior court jurisdiction on any of these grounds.  Instead, defendants challenged the plaintiffs' claim only on the basis that the plaintiffs failed to exhaust administrative remedies as required under R.I.G.L. § 44-5-26, which provides, in pertinent part, that

> "Any person aggrieved <u>on any ground whatsoever</u> by any assessment of taxes against him or her in any city or town . . . may, within thirty (30) days from the date the first tax payment is due, file an appeal to the local assessor . . . . The assessor has forty-five days to review and render a decision.  The taxpayer if still aggrieved may appeal to the local tax board of review within ninety (90) [days] from the date the first tax payment is due.  The local tax board of review shall, within ninety (90) days of the day the appeal was filed, hear the appeal and must render a decision within thirty (30) days of the date the hearing was held . . . .  Any person still aggrieved <u>on any ground whatsoever</u> by an assessment of taxes against him or her in any city or town may, within thirty (30) days of the tax board of review decision notice, file a petition in the superior court for the county in which the city or town lies for relief from the assessment . . . .

R.I.G.L. § 44-5-26 (emphasis added).  In addition to the jurisdiction granted under R.I.G.L. § 44-5-26, § 44-5-27 adds

-20-

that "[a] taxpayer alleging an illegal or void tax assessment against him or her shall be confined to the remedies provided by § 44-5-26, except that the taxpayer shall not first be required to file an appeal with the local assessor." Even if plaintiffs' claims are later determined to be subject to these exhaustion requirements, an issue I need not decide, the plaintiffs would still have an adequate remedy in state court once these exhaustion requirements are satisfied.

Neither the plaintiffs nor the defendants have briefed the issue of sufficient state court remedy, nor has either party cited any facts in the record to suggest that state court jurisdiction would be lacking. On my independent review of the applicable statutes, I find that the parties have adequate means to pursue state remedies in the Rhode Island superior courts. Should the plaintiffs fail to persuade the superior court that the City of Cranston's sewer assessment is unconstitutional, they may pursue ordinary avenues of appeal to the Rhode Island Supreme Court, and ultimately, to the United States Supreme Court. Consequently, I conclude that, on the basis of the statutory sections cited above, the State of Rhode Island provides its citizens with a plain, speedy, efficient and adequate remedy to challenge a municipal tax.

Since both requirements of the TIA have been met, I grant the plaintiffs' motion to dismiss and remand the claims in this case, without prejudice, to the jurisdiction of the Rhode Island state courts.

SO ORDERED.


_____
Paul Barbadoro
Chief Judge

March 29, 1999

cc:  Kevin McKenna, Esq.
     Joseph Cavanaugh, Jr., Esq.
     William Landry, Esq.
     Clerk, USDC-RI