JUSTICE COATS, dissenting.
¶ 36 In relieving Aspen of compliance with the popular approval requirements of the Taxpayer's Bill of Rights, I believe the majority so far departs from not only the language and clear intent of the constitutional amendment itself, but also the commonly accepted distinction between charging for something in particular and raising revenue for other governmental purposes, as to call for some response. Notwithstanding its long-overdue critical analysis of the fundamental concepts involved, with much of which I agree, the majority's ultimate decision to uphold Aspen's exaction appears to disregard the very distinction it earlier articulates and effectively sever the essential link between the amount charged and the cost of the benefit provided. Because I believe Aspen's "bag fee" simply cannot be upheld on the record before us, and because I believe that in purporting to do just that, the majority disserves legislative bodies struggling to meet the funding obligations of government without violating TABOR, I respectfully dissent and briefly outline my concerns.
¶ 37 Initially, I must note my belief that the majority tips the scale in favor of a particular outcome by characterizing the issue as a binary choice whether Aspen's paper bag charge is a tax or a fee, and since TABOR defines neither of these terms, imputing to TABOR what it considers to be the meanings given them by this court in substantially different contexts in the past. By contrast, I believe the question for purposes of this TABOR analysis is more appropriately characterized as whether the exaction imposed by Aspen on paper grocery bags is a new revenue-raising measure, requiring the direct approval of the voters. The relevant language of the constitution actually requires voter approval in advance for "any new tax, tax rate increase, mill levy above that for the prior year, valuation for assessment ratio increase for a property class, or extension of an expiring tax, or a tax policy change directly causing a net tax revenue gain," and imposes specific limits on both governmental spending and revenue changes. Colo. Const. art. X, § 20 (4)(a).
¶ 38 Even if we had previously attempted a global definition of "fees" as something distinct from "taxes," along the broad lines articulated by the majority today, I would therefore see no reason to think TABOR was intended to excuse from voter approval every governmental exaction meeting the majority's definition of a "fee." In fact, I believe both our prior use of the term "fees" and the dictates of TABOR are more reasonably understood as implicitly acknowledging the intuitive and virtually universally-accepted understanding that a charge for no more than the value or cost of some benefit-whether that be in the form of a privilege, a franchise, a license, a permit, or a good or service-provided by the government to a purchaser, or payer, does not amount to raising revenue at all, but is rather in the nature of a sale or direct exchange of things of comparable value, as in any proprietary transaction. While the majority at times expresses precisely this concept in distinguishing a "tax" from a "fee," at other points in its analysis, and particularly in applying this distinction to the bag exaction in this case, it subtly expands the "purpose" for which an exaction may be permissibly imposed and yet qualify as a fee. Although at times the majority quite rightly reasons that the characterization of an exaction as a fee is dependent upon a "reasonable relationship" between the amount of that exaction and the costs of the service for which it is paid, the majority ultimately concludes that it is enough that the exaction bear a "reasonable relationship" to a "comprehensive regulatory regime," some aspect of which (apparently no matter how comparatively *517 insignificant) serves to regulate the activity for which the charge is exacted.
¶ 39 Neither I nor the Union of Taxpayers opposing Aspen's so-called "bag fee" suggests that TABOR requires direct voter approval for every governmental exaction, regardless of its nature. There is no suggestion, for example, that a monetary penalty, or fine, imposed for violating a criminal proscription constitutes a tax. Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 567, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) ("In distinguishing penalties from taxes, this Court has explained that 'if the concept of penalty means anything, it means punishment for an unlawful act or omission.' "). While our own pre-TABOR case law differentiating among governmental exactions is largely confined to explaining why certain exactions are not properly characterized as ad valorum property taxes, see Bloom v. City of Fort Collins, 784 P.2d 304, 308-09 (Colo. 1989) ; Zelinger v. City & Cty. of Denver, 724 P.2d 1356, 1359 (Colo. 1986), and our only post-TABOR discussion touching on the distinction between taxes and fees is limited to the question whether exactions indisputably imposed as fees can lose that status by ultimately being applied to purposes altogether different from paying for the benefit for which they were imposed, see Barber v. Ritter, 196 P.3d 238, 248-49 (Colo. 2008), a rich body of case law accepting that not all non-penal governmental exactions amount to taxes is to be found in attempts by the federal judiciary to apply the Federal Tax Injunction Act. And as that body of case law largely demonstrates, while there is clearly much room for debate about how indirectly governmental expenses may be related to the benefit provided and still be fairly treated as a "cost" of or payment in exchange for the value of that benefit, it is the offsetting or defraying of that cost, sometimes including even broad social costs associated with providing the benefit, or recouping that value, that distinguishes a fee from a tax. See Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist., 166 F.3d 835, 838 (6th Cir. 1999) ; San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n, 967 F.2d 683, 685 (1st Cir. 1992) ; Union Pac. R. R. Co. v. Pub. Util. Comm'n of Or., 899 F.2d 854, 860-61 (9th Cir. 1990).
¶ 40 I believe the majority's distinction between the exercise of the government's police powers in the interest of the health, safety, and welfare of the public, on the one hand, and the exercise of its power to tax, on the other, to be very significant, but not precisely for the reasons expressed by the majority. While regulating a privilege or benefit granted by the government may be necessary to prevent its exercise from threatening the health, safety, or welfare of the public or the destruction of public resources, and therefore the cost of that regulation may appropriately be treated as an indirect cost of granting the benefit in the first place, the mere fact that an exaction is imposed for regulatory purposes, or is earmarked to fund a "regulatory regime," cannot change its character as a tax or other revenue-raising exaction. The exercise of its police powers is a fundamental obligation of government, for which it is not only permitted but in fact required to raise revenue. Conceptually, a governmental exaction for regulatory purposes can amount to a non-revenue-raising fee, especially in the context of TABOR, only to the extent that the amount of the exaction is reasonably related to the cost of the benefit, service, or "activity" for which it is imposed-not for the non-incidental regulation of other activities. I believe the majority's conclusion upholding Aspen's grocery bag exaction not only demonstrates that the majority has lost sight of the purpose of the inquiry-to determine whether an exaction is something other than a revenue-producing tax, which would require voter approval-but also that it simply fails to realistically account for the incidents of Aspen's bag "fee," as established by the record in this case.
¶ 41 Rather than simply comparing the cost of the benefit and the amount charged for it, the majority looks to the "primary purpose" of the ordinance. While it acknowledges, as it must with regard to tax statutes in particular, that the meaning of enabling legislation must be based on realities, or function, rather than labeling, or form, see Barber, 196 P.3d at 250 n.15 (expressly acknowledging that a statutory charge may be *518 labeled a fee but in effect be a tax); Apollo Stereo Music Co. v. City of Aurora, 871 P.2d 1206, 1209-10 (Colo. 1994) ; People v. Becker, 159 Colo. 562, 413 P.2d 185, 186 (1966) ("It is a familiar and well documented rule of law that taxation is concerned with realities and that, in considering tax matters, substance and not form should govern."); see also Nat'l Fed'n of Indep. Bus., 567 U.S. at 544, 132 S.Ct. 2566 ("It is true that Congress cannot change whether an exaction is a tax or a penalty for constitutional purposes simply by describing it as one or the other.") (emphasis in original), the majority nevertheless considers the "label" chosen by the legislature to be "a fairly straightforward way" to determine whether it is exercising its taxing power. Especially with regard to the Taxpayer's Bill of Rights, the express purpose of which was to limit the ability of representative legislative bodies to raise revenue without submitting the question to the voters in the form of a plebiscite, the primary purpose of an exaction must be determined by its actual effect notwithstanding an indisputable intent of the legislature to avoid subjecting the exaction to voter approval altogether.
¶ 42 In fairness, after finding Aspen's stated purpose to be evidence that it did not enact a tax, the majority openly concedes that the "government service for which the bag user is paying a fee is the waste disposal that will be necessitated by the use of that bag," maj. op. ¶ 31, and it purports to examine the actual effect of the bag charge relative to that cost. However, after noting that "a charge may incidentally benefit the general public without becoming a tax," maj. op. ¶ 30, and that a "fee charged as part of a regulatory regime such as this one does not need to exactly match the cost of providing the service or regulating the activity," maj. op. ¶ 32, the majority simply announces, ex cathedra, that "it is plainly reasonable for Aspen to charge $0.20 per non-reusable bag to defray the costs of its waste-management scheme." Id. (emphasis added). To the extent the majority intends that the reasonableness of the charge be determined as compared to the costs of Aspen's waste-management program as a whole because it is a "comprehensive regulatory scheme," I consider that proposition unjustifiable for the reasons I have already explained; to the extent the majority intends that the broader regulatory purposes of the program funded by the charge are merely "incidental" to the recycling of the grocery bags in question, that proposition simply bears no relation to the record of findings in this case.
¶ 43 While categorization as a fee is clearly not dependent upon a precise one-to-one correspondence between the charge and the benefit provided, and while protecting the public from any deleterious effects of exercising the privilege or benefit is legitimately viewed as an indirect cost of providing the benefit itself, revenue may not be raised for other regulatory purposes beneficial to the public by setting the charge to a payer higher than necessary to offset the cost of the benefit provided him, and still be characterized as a "fee." Were it not obvious that a $0.20 charge can in no way reflect the cost of recycling a single paper grocery bag, the findings of the court in this case dispel any such suggestion. The district court expressly found that the "fees" in question are to be deposited into a "Waste Reduction and Recycling Account" administered by the City Environmental Health Department, to be used not only for various programs related to reducing and mitigating waste from disposable grocery bags but also for other programs related to waste management more generally, including: "the purchase and distribution of reusable shopping bags to residents and visitors; the implementation of education programs regarding the impacts of trash and disposable bags on the environment and the city's waste stream; the funding of waste reduction and recycling programs; purchasing and installing recycling containers and waste receptacles; maintaining a website to update residents on waste reduction efforts; and paying for the cost of administering the program." These services had been provided to city residents and visitors prior to the adoption of the ordinance and were paid for with general fund revenues, and they are currently made available to all city residents and visitors, whether or not they pay the bag charge. Rather than the city's general waste reduction program being incidental, in any meaningful sense, to the disposal and recycling *519 of paper grocery bags, it is the latter that is clearly incidental to the former.
¶ 44 Perhaps most importantly, however, the court also found from the undisputed evidence that the amount of the exaction was not set by simply analyzing the cost of collection, disposal, and recycling of the bags but rather was based on a "community consensus" concerning what would be required to modify the behavior of disposable bag users. As indicated by a city memorandum submitted as an exhibit, the purpose of the fee was "to create awareness around the topic of single use items." The memorandum further indicated that the amount of the fee had to be "high enough to incentivize change," and that the city staff felt that "a fee of $0.20 on paper bags" would be high enough to accomplish that, while a "smaller ten or fifteen cent fee would likely not be enough to affect the actions of customers."
¶ 45 Imposing a monetary exaction on the exercise of a privilege or the performance of a lawful act, in an amount designed to deter or dissuade the person charged from exercising that privilege or performing that act, is generally classified as a tax and, at least colloquially, designated a "sin tax." The term "sin tax" is used to refer to "[a]n excise tax imposed on goods or activities that are considered harmful or immoral...." Black's Law Dictionary 1597 (9th ed. 2009); see also Naifeh v. State ex rel. Okla. Tax Comm'n, 400 P.3d 759, 770-75 (Okla. 2017) (concluding that an exaction imposed on cigarettes was a tax, not a regulatory fee, and, therefore, constituted a "revenue bill" that had been unconstitutionally enacted). While perhaps not designed exclusively to raise revenues, exactions in the nature of sin taxes clearly contain an element of revenue raising and have therefore been characterized as "[t]axes that seek both to deter and to collect revenue when deterrence fails." Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc., 651 F.3d 722, 730 (7th Cir. 2011) (Posner, J., writing for the Seventh Circuit Court of Appeals sitting en banc, colorfully distinguishing taxes from fees for purposes of the federal Tax Injunction Act and explaining that "sin taxes" are considered a form of tax rather than a fee or penalty).
¶ 46 Unlike a penal exaction, on the one hand, a sin tax reflects a legislative choice not to proscribe a particular good or activity and impose a fine for the violation of its proscription; but instead to make lawful the undesirable good or activity, in exchange for the payment of a charge, calculatedly set in excess of the amount of general sales or use taxes on comparably priced goods. Unlike a fee, on the other hand, it reflects a choice to raise revenue, rather than merely offset expenses, by imposing an exaction greater and for purposes other than defraying the costs of providing or regulating the targeted good or activity itself. As a broadly recognized classification, see, e.g., Rachel Holmes Perkins, Salience and Sin: Designing Taxes in the New Sin Era, 2014 B.Y.U. L. Rev. 143, 155, 175 (2014) (noting that the "movement to 'go green' has included a movement to target sin taxes at eco-unfriendly activities[,]" including "on behaviors such as paper and plastic bag use" in some thirty jurisdictions), there is every reason to believe that the distinction between a "sin tax" and a "fee" was intended by the voters in enacting the Taxpayer's Bill of Rights.
¶ 47 In all meaningful respects, Aspen's "waste reduction fee" is in the nature of, and functions entirely as, a "sin tax." Like the other excise taxes for which they are responsible, grocers must collect, report, and remit the "waste reduction fee" to the city. Aspen City Code § 13.24.050 (2017). While imposing a charge on its customers for paper grocery bags may not be described in the ordinance as a sale, the grocer is nevertheless permitted to retain a portion of the "fee" it exacts, just as with a sale, id., and the exaction is effectively imposed upon an occurrence, or the "use" of a product, just as with excise taxes generally. Most importantly, however, as the district court expressly found, this "fee" is "intended to deter conduct rather than provide a specific quid pro quo service to those who pay the bag charge." Instead, it is clearly imposed, in the absence of complete deterrence, to raise revenue for a number of environmental purposes that are not merely incidental to the cost of regulating the use of paper bags.
*520 ¶ 48 In the greater scheme of things, sanctioning a $0.20 exaction by the City of Aspen on paper grocery bags without first getting direct voter approval does not seem to be a matter of great consequence. In light of the city's representations concerning community consensus in setting the amount of the exaction, it does not even appear that acquiring voter approval in this particular community would have been difficult. Were the outcome of this single case my only concern, it would therefore hardly have been worth the time and effort to write.
¶ 49 Of much greater concern to me is the potential effect of that outcome on the majority's legal analysis. While there is much in the majority's test for determining whether exactions are subject to voter approval with which I could agree, I fear that in light of its sanctioning the exaction at issue here, the language in which the majority expresses its rationale cannot be taken at face value. As I believe the words actually used by the majority make clear, operating in a largely fee environment, even if doing so requires greater precision in particularizing charges to benefits, is nevertheless doable. Whether it might be preferable to allow representative legislative bodies greater flexibility in the use of tax policy to accomplish socially desirable ends is not a matter within the purview of the judiciary.
¶ 50 I respectfully dissent.
I am authorized to state that JUSTICE BOATRIGHT joins in this dissent.