OSCN Found Document:NAIFEH v. STATE ex rel. OKLAHOMA TAX COMMISSION

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 NAIFEH v. STATE ex rel. OKLAHOMA TAX COMMISSION
2017 OK 63
Case Number: 116102
Decided: 08/10/2017
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2017 OK 63, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

JAMES P. NAIFEH, STANDARD DISTRIBUTING COMPANY, BRIAN HUTCHINSON, HUTCHINSON OIL COMPANY, LLC, PHILIP MORRIS USA INC., R.J. REYNOLDS TOBACCO CO., ROGERS OIL CO., INC., COREY L. COOPER, STEPHENSON WHOLESALE COMPANY, INC., Petitioners,
v.
STATE OF OKLAHOMA, ex rel. OKLAHOMA TAX COMMISSION, THE HONORABLE MARY FALLIN, GOVERNOR, in her official capacity, THE HONORABLE SENATOR MIKE SCHULZ, SENATE PRESIDENT PRO TEMPORE, in his official capacity, THE HONORABLE REPRESENTATIVE CHARLES MCCALL, SPEAKER OF THE HOUSE, in his official capacity, Respondents.

APPLICATION TO ASSUME ORIGINAL JURISDICTION AND PETITION FOR DECLARATORY RELIEF AND WRITS OF PROHIBITION AND/OR MANDAMUS

¶0 Petitioners, who are manufacturers, wholesalers, and consumers of cigarettes, challenged Senate Bill 845, alleging that it is a revenue bill enacted outside of the procedure mandated in Article V, Section 33 of the Oklahoma Constitution. The parties agree that the passage of SB 845 did not comply with Article V, Section 33; so the case turns on whether SB 845 is the kind of "revenue bill" that Article V, Section 33 governs. Applying the test we have utilized since 1908, we conclude that the primary purpose of Sections 2, 7, 8, and 9 of SB 845 is to raise new revenue for the support of state government through the assessment of a new $1.50 excise tax on cigarettes and that, in doing so, SB 845 levies a tax in the strict sense. As such, Sections 2, 7, 8, and 9 of SB 845 comprise a revenue bill enacted in violation of Article V, Section 33 and are unconstitutional.

ORIGINAL JURISDICTION ASSUMED. DECLARATORY RELIEF GRANTED.

Robert G. McCampbell, Jay P. Walters, and Justin Lollman, GableGotwals, Oklahoma City, Oklahoma; Lisa S. Blatt, Sarah Harris, and Rosemary Szanyi, Arnold & Porter Kaye Scholer LLP, Washington, DC, for Petitioners James P. Naifeh, Standard Distributing Company, Brian Hutchinson, Hutchinson Oil Company, Philip Morris USA Inc., Corey L. Cooper, and Stephenson Wholesale Company, Inc.

Robert A. Nance, Riggs, Abney, Neal, Turpen, Orbison & Lewis, P.C., Oklahoma City, Oklahoma, for Petitioners R.J. Reynolds Tobacco Company and Rogers Oil Co.

Mithun S. Mansinghani and Michael K. Velchik, Office of the Attorney General, State of Oklahoma, Oklahoma City, Oklahoma, for Respondents.

Wyrick, J.:

¶1 Article V, Section 33 of our Constitution restricts the Legislature's ability to enact "revenue raising" measures. It does so by requiring that such measures (1) originate in the House of Representatives, (2) be enacted prior to the last five days of the legislative session, and (3) be approved either by the people or by a three-fourths majority in each legislative chamber.[1]

¶2 Senate Bill 845, the "Smoking Cessation and Prevention Act of 2017,"[2] will generate approximately $225 million per year in new revenue for the State through a new $1.50 assessment on each pack of cigarettes. The measure originated in the Senate, was passed on the last day of the legislative session, and garnered only a bare majority of votes in each legislative chamber.

¶3 All parties agree that if Article V, Section 33's requirements apply to SB 845, the measure must be invalidated for failure to comply with those requirements. The question presented by this case is thus whether SB 845 is a "revenue raising" measure. We conclude that it is and was thus enacted in violation of Article V, Section 33.

I.

¶4 After years of declining revenues forced the Legislature to repeatedly make use of non-recurring revenue sources to balance the budget, both the Legislature and the Governor recognized that balancing the budget in 2018 would be impossible without either significant reductions in government spending, the creation of new revenue streams, or perhaps both.[3]

¶5 In her 2017 State of the State address, Governor Mary Fallin pleaded with the Legislature to "focus on the REALITY of our state budget deficit," arguing that the Legislature could not "afford to pass another budget using a large amount of non-recurring revenue" because "[i]t is important to provide sufficient revenues to meet the basic responsibilities that our government owes to its citizens."[4] To accomplish this goal, the Governor urged the Legislature "to raise our cigarette tax" so that "[t]he revenue raised can be spent on current health care needs."[5]

¶6 The Legislature heard the Governor's call. Four proposals originated in the House of Representatives,[6] each of which proposed to levy a new $1.50-per-pack excise tax that would be assessed against cigarette wholesalers by the Oklahoma Tax Commission, who would then transmit the collected revenue to the State Treasury for deposit in certain health-agency operating funds. The Tax Commission would enforce collection of the tax through its Cigarette Excise Tax Stamps regime. Each of the proposals also allowed for Indian tribes to receive portions of the new tax revenues pursuant to their Tobacco Tax Compacts with the State. Two of the four proposals received a floor vote in the House and garnered majority support, but none of the proposals advanced, due to their failure to receive the three-fourths support required by Article V, Section 33. By May 20, 2017, six days prior to the end of the legislative session, the House proposals were abandoned.

¶7 On May 24th, however, SB 845, a shell appropriation bill relating to funding for the State Department of Health, was rewritten in the Senate as a measure to impose a new $1.50-per-pack assessment on cigarettes. Like the House proposals, SB 845 proposed that the $1.50-per-pack assessment would be imposed upon the cigarette wholesaler, collected by the Oklahoma Tax Commission, and enforced by the Tax Commission through its Cigarette Excise Tax Stamps regime. Likewise, the revenues collected would be transmitted to the State Treasurer to fund state health agencies,[7] and Indian tribes would be entitled to a portion of the revenues pursuant to their Tobacco Tax Compacts. Unlike the failed House proposals, though, SB 845 described the $1.50-per-pack assessment as a "smoking cessation fee" rather than a tax, said that the purpose of the assessment was to reduce the incidence of smoking by increasing its cost, earmarked $1 million of the expected $257 million in new revenues for enforcement of prohibitions on underage tobacco use,[8] and created several new sections of law that expressed in various forms the State's policy against smoking. The Senate passed SB 845 the same day it was introduced, by a 28-18 vote.

¶8 The failed House measures did not indicate that the purpose of the $1.50 assessment was to reduce the incidence of smoking, nor did they mention any non-revenue-raising regulatory purpose. Three of the four explicitly stated that their purpose was to "provid[e] revenue for the support of the functions of state government,"[9] while the fourth described itself as "[a]n Act . . . imposing additional tax levy upon cigarettes."[10] There is nothing in the legislative record demonstrating why, in the handful of days between May 20th (the date of last amendment to the last House proposal, HB 2414) and May 24th (the date the newly amended SB 845 was introduced), the Legislature's stated purpose shifted from raising revenue to reducing the incidence of smoking. There were no committee hearings held, no testimony taken, and no evidence received by the Legislature in that timeframe that would explain the sudden shift in purpose.

¶9 What is apparent is that by May 26th, with the end of the legislative session looming, the Legislature had not yet fulfilled its constitutionally-mandated duty to enact a balanced budget.[11] The House had just passed SB 860, the General Appropriations Bill, but that budget was predicated on SB 845's creation of over $200 million in new revenues.[12] This meant that the House was confronted with a constitutional conundrum: either pass SB 845, which was essential to balancing the budget but would perhaps require violating Article V, Section 33, or don't, and violate Article X, Section 23 by failing to balance the budget. As one legislator put it, this was "a decision between bad or worse."[13] The House ultimately passed the measure that day, by a vote of 51-43. The measure was set to take effect ninety days after it became law.

¶10 This original action was commenced shortly thereafter by individuals who purchase cigarettes and retailers, wholesalers, and manufacturers of cigarettes, each claiming they will suffer economic harm if SB 845 becomes effective. These Petitioners seek a declaration that SB 845 was enacted in violation of Article V, Section 33, and a writ prohibiting the various State Respondents from enforcing the measure. Petitioners also sought a stay of the enforcement of SB 845 should we not render our decision prior to the measure's effective date. We now assume original jurisdiction, and grant Petitioners declaratory relief,[14] rendering moot their request for a stay.

II.

A.

¶11 Our Constitution grants to the Legislature the power to legislate on any "rightful subject."[15] Thus, "[e]xcept where it encounters a specific constitutional [provision] prohibiti[ng]" it from taking a particular action, "the Legislature has the right and the responsibility to declare the fiscal policy of Oklahoma."[16]

¶12 One such constitutional provision limiting the Legislature's ability to make fiscal policy is Article V, Section 33, which places several restrictions on the Legislature's power to enact "revenue bills." Included in Oklahoma's original Constitution, Section 33 required that "[a]ll bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills. No revenue bill shall be passed during the five last days of the session."[17]

¶13 Section 33 remained in that original form until 1992, when State Question 640 was placed on the ballot through initiative petition, with a ballot title asking the people the following:

This measure amends the State Constitution. It adds new provisions to Section 33 of Article 5. These would change the method by which state government makes laws that raise revenue. The measure requires that a bill to raise revenue be voted upon by the people at the next general election. A bill would not be effective until it was approved by a majority of the voters. The measure also provides a way that a revenue bill could become law without a vote of the people. A bill would have to be approved by a ¾ vote of each house of the legislature and go to the Governor for proper action. A revenue bill approved by a ¾ vote of each house of the legislature would not become effective until ninety days after the approval date. Such a bill would not be subject to the emergency measure provision.

Shall the proposed Constitutional amendment be approved?[18]

Opposed by many then serving in the Legislature,[19] the amendment was widely regarded as a decision by the people of Oklahoma to greatly limit the Legislature's ability to enact new taxes.[20] The people approved the measure at special election, modifying Section 33 so that it now also contains the Nation's most stringent legislative super-majority requirement, mandating that revenue bills either be approved by the people or by three-fourths of the Legislature.[21]

¶14 Article V, Section 33 is but one of several fiscal policies placed in our Constitution by the people, and to properly understand Section 33, one must understand it within the context of those other policies. First, the people have directed that Oklahoma be a "pay as we go" State by limiting state and local governments' abilities to incur debt,[22] and by spelling out specific procedures to "ensure a balanced annual budget."[23] Under Article X, Section 23, for example, the State Board of Equalization must certify the amounts available to the Legislature for appropriation based on the State's projected revenues,[24] and the Legislature is prohibited from appropriating more than the certified amount unless it has enacted new laws providing for new revenue or otherwise accounting for the difference.[25]

¶15 Second, the Constitution directs that there is a "revenue failure" when the State collects less revenue than anticipated and that all appropriations in excess of actual collections are voided by the failure.[26] The Legislature can attempt to cure the failure by calling a special session to enact new revenue-raising measures,[27] or the State can tap into the Constitutional Reserve Fund.[28] But if neither of those steps is taken, all appropriations are automatically reduced on a pro rata basis to account for the deficiency and to bring the budget into balance.[29]

¶16 Read together with Article V, Section 33, these constitutional provisions mandate fiscally responsible government that operates on a strictly pay-as-it-goes basis, and they indicate-by strictly limiting the Legislature's ability to enact laws that generate additional revenue-the people's preference that when revenues shrink, so too does their government. Easy to dismiss as mere procedural or technical requirements, these various constitutional provisions in fact create the substantive framework for how our state government extracts and spends the people's money.

B.

¶17 "Revenue bill" is a capacious term; so very shortly after ratification of the original Constitution, we were asked to define it. In Anderson v. Ritterbusch, we held that "bills for raising revenue" are those "whose principal object is the raising of revenue, and not those under which revenue may incidentally arise," and which "levy taxes in the strict sense of the word."[30] We have applied that two-part test in the years since to hold that measures "requiring payment of a tax or license fee for the privilege of operating [a] business" that profits from the use of State resources are not revenue bills, so long as the fee or tax is "merely incidental to the enforcement of the real [regulatory] purpose of the act."[31] And we have more recently excluded from the definition of "revenue bill" measures which will result in less revenue being collected, rather than more.[32]

¶18 In that most recent case, Fent v. Fallin, we also explained the effect of the 1992 amendment to Article V, Section 33, recognizing that the meaning and effect of the as-amended section is controlled by the plain meaning of the amendment's text.[33] The original public understanding of the text was critical, we said, because "[c]onstitutional provisions are not made for parsing by lawyers, but for the instruction of the people and the representatives of government."[34] "A constitutional provision" like Section 33, we concluded, "must be construed considering its purpose and given a practical interpretation so that the manifest purpose of the framers and the people who adopted it may be carried out."[35]

¶19 In Fent we were faced with a previously unanswered question: can a bill that decreases revenue be a "revenue bill"? Thus, we asked, "[W]hat would the ordinary person who voted on the 1992 amendment, as explained by its ballot title, understand they were approving regarding the generation of State revenue[?]"[36] Applying that interpretive standard to the terms of the amendment, we said, "reveals [that] the 1992 amendment had two primary purposes."[37] First, it "limit[s] the generation of State revenue to existing revenue measures" and second, it "requires future bills 'intended to raise revenue' to be approved by either a vote of the people or a three-fourths majority in both houses of the Legislature."[38] As such, we concluded that bills that decreased revenues were not subject to Article V, Section 33's requirement.

¶20 It is against this backdrop that we must evaluate SB 845 to determine whether it is the type of measure "intended to raise revenue" that the people have mandated be enacted only through legislative super-majority or popular vote.

III.

¶21 Whether SB 845 is subject to Article V, Section 33's requirements depends on whether its "principal object is the raising of revenue" and whether it "lev[ies] taxes in the strict sense of the word."[39] The State Respondents argue (1) that SB 845's primary purpose is to reduce the incidence of smoking and compensate the state for the harms caused by smoking, and that any raising of revenue is merely incidental to those purposes; and (2) that SB 845 does not levy a tax, but rather assesses a fee, the proceeds of which will be used to offset the costs of State-provided healthcare for those who smoke. Neither argument is persuasive.

A.

1.

¶22 As a threshold matter, Petitioners present compelling contextual evidence in support of their claim that the Legislature's primary purpose in enacting SB 845 was to raise new revenues. The State Respondents urge us to ignore that evidence, and understandably so; it strongly indicates SB 845's passage was motivated by the Legislature's need to raise revenue so that it could satisfy its constitutional obligation to enact a balanced budget. We agree that a measure's purpose must be measured by its actual operation and effect,[40] rather than by any legislator's statements as to what motivated his or her vote for the measure.[41] But this dispute over the relevance of contextual evidence is ultimately of no consequence because SB 845's text-and text alone-conclusively demonstrates that the primary operation and effect of the measure is to raise new revenue to support state government.

¶23 Nominally "[a]n Act relating to public health," SB 845 contains nine sections, one of which is amendatory, and eight of which create new law. The State Respondents insist that SB 845 is a regulatory measure designed to decrease the incidence of smoking, and a statement of that purpose is indeed found in Section 1 of the bill. This statement of purpose, however, is not to be codified. So it cannot be said to impose any new regulatory requirement; it is simply an expression of the Legislature's desire that fewer Oklahomans smoke cigarettes.

¶24 Section 2 is also an uncodified section, stating the Legislature's intent that "the revenues derived pursuant to the fee imposed in Section 7 of this act be used . . . for the purposes of preventing Oklahomans from smoking cigarettes and encouraging Oklahomans who already do so to cease cigarette smoking."[42] This section is also not regulatory in nature, as it imposes no new legal obligations on anyone, nor does SB 845 contain any other sections effectuating this legislative desire that the revenues derived be used for smoking-cessation efforts. To the contrary, a later section directs that only a tiny fraction (about 0.5%) of the revenues are to be apportioned to a fund used for smoking-cessation efforts, with the remainder being directed to a fund that will be used by various health-related state agencies to fund their general operations-with no requirement that any portion be used for smoking-cessation efforts.

¶25 Section 3 makes minor amendments to an existing section of law, 63 O.S.2011, § 1-1525. Previously a section of law requiring state and local governments to post no-smoking signs in public places where smoking is prohibited, the amendment now requires that those signs be "conspicuous" and placed "in prominent locations." While this section is regulatory in nature, it cannot be fairly characterized as imposing any meaningful, new regulatory obligation; it merely (slightly) amplifies an existing obligation.

¶26 Section 4 creates a new section of law at 63 O.S. § 1-1528, directing that "[t]he State Department of Health and the Tobacco Settlement Endowment Trust shall work together to inform the public about the dangers of smoking in motor vehicles where children are present." Other than that general declaration to the agencies, SB 845 does not provide more specific direction nor does it send any money to those agencies as funding for the directive.

¶27 Section 5 creates a new section of law at 63 O.S. § 1-1529, prohibiting the use of tobacco on all properties owned, leased, or contracted for use by the State, excluding veterans centers. While this section is new, it is partially duplicative of the Smoking in Public Places and Indoor Workplaces Act[43] (which has, since 1987, generally regulated and prohibited smoking in specified public places and outdoor areas) and appears to be a codification of an executive order issued by Governor Mary Fallin in 2012[44] (which already prohibited smoking on State property using language similar to that of this new section). Thus, this section does not create any new State regulatory policy; it merely codifies and slightly broadens a policy already in effect.

¶28 Section 6 creates a new section of law at 63 O.S. § 1-1530 and directs that "[t]he Oklahoma State Department of Health and the Department of Mental Health and Substance Abuse Services shall work together to develop new and innovative strategies to prevent tobacco use by minors." But, like Section 4, it does not provide any specific mandates to those departments nor are funds earmarked to support the directive.

¶29 Section 7 creates a new section of law at 63 O.S. § 1-1531, imposing a new $1.50-per-pack "smoking cessation fee" on cigarettes and stating the Legislature's rationale in imposing this fee. Describing the various health risks posed by smoking, Section 7 provides as the legislative justification for the new assessment that "[i]ncreasing the price point of cigarettes is the single most effective strategy to reduce cigarette consumption." Section 7 directs the Oklahoma Tax Commission to collect the new "fee" and transmit the proceeds to the State Treasurer, who is directed to deposit $1,000,000 per year in the ABLE Commission Revolving Fund, and all other amounts-which the Legislature anticipated would be $256,841,000[45]-to the "Health Care Enhancement Fund."

¶30 Section 8 creates a new section of law at 63 O.S. § 1-1532, which creates the new "Health Care Enhancement Fund" described in Section 7 as the destination for the bulk of the revenue collected from the new assessment. Section 8 gives the Legislature full discretion to appropriate the revenue deposited in the new fund "for the purpose of enhancing the health of Oklahomans." Despite Section 2's uncodified statement that the revenue derived from the new fee be used for efforts to reduce smoking, Section 8 does not earmark any of the revenue in the new fund for that purpose.

¶31 Section 9 is an uncodified section directing the Oklahoma Tax Commission to enforce remittance of the fee in a manner similar to how it enforces collection of the cigarette excise tax-by limiting the amount of cigarette excise tax stamps that can be sold to each wholesaler. The effect of this provision is to enforce remittance of the new revenues generated by SB 845 by leaving wholesalers who fail to remit the new fee to the State without the excise tax stamps they need to lawfully sell cigarettes.[46]

2.

¶32 In evaluating a measure's purpose, we are careful not to elevate form over function. Thus, we look to "what the legislation actually accomplishes . . . and not [to] what a legislature states it is accomplishing."[47] Looking solely to the text of SB 845, its nine sections certainly demonstrate a purported purpose of reducing the incidence of smoking. But the text simultaneously demonstrates that the smoking-reduction purpose is effectuated through the collection of revenue from wholesalers-and ultimately consumers-of cigarettes. The $1.50-per-pack assessment is the only provision in SB 845 that the text directly links to its stated purpose of reducing smoking,[48] and the State Respondents concede that the assessment is the linchpin of SB 845's regulatory framework. Thus, even if the Legislature was concerned with reducing the incidence of smoking-and it undoubtedly was-the means by which it chose to effectuate that regulatory end was the collection of revenue from those who purchase cigarettes. Indeed, the measure accomplishes its regulatory goal precisely by "impos[ing] a burden on taxpayers" such that they purchase fewer cigarettes because of the increased cost.[49]

¶33 And because the revenue to be collected is so substantial (the single largest source of new revenue for the State, according to the State Board of Equalization),[50] SB 845's allocation of those revenues makes up a significant part of the measure's actual effect. The State Respondents argue that the revenues will be put to the "regulatory" use of offsetting the financial burdens that smoking imposes on the State. This argument fails both as a matter of law and fact. First, all government spending is "regulatory" in some sense, in that the machinery of state government is all the creation of one regulatory scheme or another. Thus, to describe spending designed to pay for the operation of state government as "regulatory" is merely to describe state government taxing and spending.[51] Second, SB 845 doesn't actually allocate the revenue to pay for smoking-related costs. Indeed, Section 7 explains that only $1 million-less than 0.5%-of the revenue is earmarked for programs designed to reduce smoking; the remaining $224 million is sent to a fund that supports the general operations of state health agencies, with no requirement that those agencies spend even a penny of the funds on smoking-related activities.[52]

¶34 Thus, while SB 845 contains certain provisions that can be characterized as regulatory, those provisions either impose no new obligations, merely amplify existing regulatory language, or codify already-in-effect state policies. The only provision in SB 845 that can be fairly characterized as effectuating a meaningful change in the law is the revenue-generating provision in Section 7. But while that provision may have a regulatory purpose, that purpose is achieved through revenue raising. And because the nexus between the smoking-reducing purpose and the actual use of the revenues is so attenuated, the raising of revenue for the general support of state government is the primary effect of SB 845, and thus its primary purpose, regardless of its concomitant smoking reduction purpose.[53]

¶35 The State Respondents correctly point out that we have previously upheld new regulatory schemes that generate "incidental" revenue, but a quarter-of-a-billion dollars per year is hardly "incidental" when the imposition of a new financial burden on the people is the avowed aim of the measure (albeit an aim designed to reduce smoking). If the Legislature had chosen to reduce smoking by making it illegal, for example, with civil penalties for those who violate the ban, the revenue generated by the penalty might well be incidental to the regulation because the regulation is the prohibition of smoking; the extraction of revenue in the form of penalties is merely the mechanism that coerces compliance with the underlying regulation.[54] Here, by contrast, the imposition of a burden on the taxpayers is itself the "regulatory" device,[55] rather than a mere appendage of the regulatory scheme. That is why we have never held that a measure imposing a cigarette tax lacks a revenue-raising purpose, and it is why those sorts of assessments have always been categorized as quintessential excise taxes, i.e., assessments made for the purpose of raising revenue for the general support of government.[56]

¶36 None of this is to say that the Legislature cannot choose this particular sort of regulatory tool--a "sin tax"[57]--to further its goal of reducing smoking. But if the Legislature wishes to deploy this tool, rather than the plethora of other regulatory tools available to it for advancing its goal, it must comply with Article V, Section 33 because the people have insisted that legislative measures "intended to raise revenue"-i.e., those whose primary effect is to reach into the people's pockets to take more money to fund state government-be significantly more difficult to enact than other types of legislation.

¶37 In sum, the enormity of the revenue generated by SB 845, when contrasted with the de minimis sums earmarked for smoking reduction programs and the scant inclusion of any other regulatory function in the bill, compels the conclusion that the generation of revenue for the support of state government was the measure's primary purpose. SB 845 is by far the single largest source of new revenue for the State, and the $225 million in new revenue it generates is necessary to balancing the budget.[58] Indeed, without the $225 million, the Legislature would have violated the Constitution for a separate reason: failure to comply with the balanced-budget mandate in Article X, Sections 23 and 25. To deny that creating this revenue in order to balance the budget was not SB 845's raison d'être is, as our Governor put it, to deny the stark "REALITY of [the] state budget crisis" facing our Legislature this past term.

B.

¶38 The State Respondents insist that this Court has "consistently taken a narrow view of what constitutes a 'revenue bill,'" and that based on our cases, measures creating "taxes and fees that are regulatory and compensate the public for harm caused by a business enterprise" are not revenue bills because they lack the primary purpose of raising revenue. While it is true that we have historically given the term "revenue bill" a more restricted meaning than its text suggests, we have never held that the term does not encompass a quintessential excise tax designed to raise a near-quarter-billion dollars in new revenue each year. The cases relied on by the State Respondents do not prove otherwise.

¶39 For example, in In re Lee[59] we upheld a measure requiring a $25 filing fee for appeals filed at this court. Because the measure "prescribes a fee to the public for services rendered by their officers, and is not exacted for revenue, but as compensation" for those services provided to the payor, the bill did not levy a tax, and thus was not a revenue bill.[60] There, the transaction was between the government (the court clerk) and the party filing the appeal, and the payor of the fee was paying for a service to be rendered to him directly by the government, i.e., the processing and deciding of his appeal. The State Respondents claim that we held in the case that "fees" can include "not only those paid to court officers 'for a particular service rendered,' but also those 'paid into the public treasury to reimburse the public for the expense incurred' by maintenance of the courts more broadly."[61] There is much wrong with this claim. First, while we did quote an Ohio decision containing the cited language, we did so in the context of discussing an Article II, Section 6 claim about access to courts, with the relevant point being that a filing fee does not deny access to the courts merely because the fee compensates the State for more than just the file-stamping of the pleadings.[62] Second, Respondents ignore that the revenues derived from the filing fee were used to compensate the court for the cost of adjudicating the appeal. That is, there was a direct nexus between the fee and the government service being provided to the payor of the fee, a far cry from the attenuated nexus between a cigarette purchaser and his theoretical future use of state services for some sort of cigarette-related illness. And in any event, the $1.50 assessment is actually assessed against the seller of cigarettes, whom no one argues will make use of any government-provided health services.

¶40 Ex parte Ambler, a Court of Criminal Appeals case, merely stands for the well-accepted proposition that a measure is not a revenue bill when it merely imposes a licensing fee on particular businesses in order to offset the costs of regulating those businesses.[63] The legislation at issue in that case created the State Board of Medical Examiners and implemented a comprehensive scheme to regulate the practice of medicine in Oklahoma. As part of the new regulatory framework, certain medical practitioners were required to be licensed by the State, and in order to be licensed, they had to submit an application and $15 fee to the Board, and then $50 annually to maintain the license. After being charged with practicing without a license, Ambler claimed that his conviction was invalid because the measure creating the regulatory regime was a revenue bill enacted in violation of Article V, Section 33. The Court of Criminal Appeals had no difficulty rejecting this argument, holding that it was "clearly apparent to an unbiased mind" that "[r]evenue is a mere incident to the law, and not the primary purpose of the law."[64] The case thus stands for nothing more than the general rule that regulatory measures that only incidentally create revenue are not revenue bills. The case says nothing about a measure intended to extract revenue from sellers of a product-and really, their customers-with no connection between the assessment and the cost of regulating the seller's business.[65]

¶41 So too for the cases relied on by the State Respondents where we have held that measures imposing a "mileage tax" on commercial over-the-road carriers are not revenue bills.[66] As we explained in those cases, the tax-which was "in the nature of a license fee" because it was paid in exchange for the privilege of engaging in a certain business-was "merely incidental to the attainment of the real purpose of the act," which was to "regulat[e] a growing effort, on the part of certain enterprises, to appropriate the public highways to their own free use as a 'transportation roadbed' for hire and profit."[67] These cases stand for the proposition that a regulatory measure is not a revenue bill when it merely requires businesses that profit from the use of State-provided infrastructure to reimburse the State for their use of that infrastructure and the cost of regulating their industry. Rather, the revenues created by such a measure are collected in exchange for the privilege of engaging in a business that burdened state infrastructure, and were incidental to the larger regulatory purpose of regulating the business of commercial carriers. These cases say nothing about a "fee" that is ultimately aimed at consumers rather than upon a business profiting from use of state services, and they say nothing about "fees" assessed as part of a regulatory measure that doesn't actually regulate the use of the state services the fee-derived revenues will be used to support.[68]

¶42 The position taken by the State Respondents is, in this regard, extraordinary. In their view even a measure that explicitly levies a massive new tax, can evade Article V, Section 33's "revenue bill" requirements so long as the tax is enacted for a "regulatory" purpose. In this respect, the State Respondents are willing to go even further than the House of Representatives because, under their view, even a measure which explicitly levies a new excise tax on cigarettes - like the four failed House measures - could have been enacted with a bare majority vote. This is so, insist the State Respondents, because the purpose of the new $1.50 assessment has always been to discourage smoking.[69] The logical end point of this position is that the Legislature can impose by bare majority any tax whose purpose is to discourage behavior disfavored by the government. One can imagine the gasoline tax being doubled "to reduce traffic congestion and wear and tear on our roads, the costs of which are overburdening the Department of Transportation," or the income tax on the top 1% being tripled "to reduce the societal ills that arise from income disparities among our citizens." Surely the people did not intend that the Legislature could blatantly tax them without complying with Article V, Section 33, by merely wordsmithing their bills to describe some "regulatory" purpose for the tax. Thus, we reiterate that whether a measure is "intended to raise revenue" must be the overarching consideration in determining whether a measure is a "revenue bill." If so, the Legislature must either muster enough votes to satisfy Article V, Section 33, or submit the measure to the people for their approval.

C.

¶43 In addition to determining that SB 845's primary purpose was to raise revenue, we also look to whether the measure "levies a tax in the strict sense." The answer to this second question is in part determined by our answer to the first, because a key difference between a tax and a fee is that a tax "is levied primarily for revenue raising purposes," while a fee "is assessed primarily for regulatory or punitive purposes."[70] The State Respondents insist, however, that the $1.50 assessment is a fee rather than a tax, and no doubt, the measure certainly describes the assessment as such. Whether an assessment is a fee or a tax, however, is not "determined by the name given it by the legislation involved" but rather "according to the mission given it by the law under which it is levied."[71] Thus, we must examine the true nature and effect of this "smoking cessation fee" to determine whether it is truly a fee, or merely an excise tax under an alias.

¶44 First, assessments of this sort on cigarettes have, for the entirety of this State's history, been enacted and codified as excise taxes.[72] SB 845's assessment is indistinguishable in function from the already-existing excise tax levied on cigarettes,[73] which is levied for the express purpose of "provid[ing] revenue for the expense of the state government,"[74] and the bulk of which, coincidentally, was approved by public referendum following the 1992 amendment to Article V, Section 33.[75] Like the excise tax, the new assessment is collected by the Oklahoma Tax Commission, is transmitted to the State Treasury for deposit in specific funds, and is treated like a tax for purposes of the Tobacco Tax Compacts entered into with various Oklahoma Indian tribes. Additionally, the Legislature itself, in the four failed House measures, attempted to levy an identical assessment as a tax.[76] By all appearances, what Section 7 describes and imposes is a quintessential "sin tax": "[a]n excise tax imposed on goods or activities that are considered harmful or immoral (such as cigarettes, liquor, or gambling)."[77]

¶45 Second, the assessment functions as a "payment exacted by the state . . . as a contribution toward the cost of maintaining governmental functions, where the special benefits derived from th[e] performance [of the function] is merged in the general benefit," which we have said, "is a tax."[78] Indeed, the distinguishing characteristic of a fee is that it is an amount paid in exchange for a specific government-provided benefit or service,[79] whereas a tax is "a forced . . . exaction . . . assessed in accordance with some reasonable rule of apportionment . . . to provide public revenue for the support of the government."[80] The toll one pays to drive on a toll road, for example, can be a fee because it is an amount paid for the about-to-be-enjoyed benefit of using a stretch of road. The transaction is between the payor and the government agency providing the benefit, the assessment is the consideration for the benefit to be conferred, and the amount of the assessment is tied to the cost of the benefit conferred (i.e., the toll amount depends on the amount of highway to be used). In other words, there is a direct nexus between the assessment and the government benefit being conferred to the payor.

¶46 The gasoline tax, on the other hand, is a tax despite the fact that it-like the toll road fee-also generates revenue that is used to pay for roads and bridges. This is so because the tight nexus between the assessment and the government benefit is lacking. The tax is paid to the state's tax collection agency rather than the agency providing any benefit or service. The assessment cannot be called consideration for any government-conferred benefit because there is no guarantee that the consumer who ultimately bears the cost of the tax will ever make use of a single road or bridge-he may well be buying gasoline for his lawnmower. Likewise, the amount of the assessment is not tied to the cost of the benefit conferred because the assessment is the same whether the buyer of a gallon of gasoline uses that gallon to travel 40 miles on Oklahoma roads, or none. Many gasoline consumers are in fact subsidizing the cost of benefits conferred on others, such as those who drive electric cars, and thus "the special benefits derived from th[e] performance [of the function] is merged in the general benefit."[81]

¶47 Here, the "tobacco cessation fee" is not paid in exchange for any specific government-conferred benefit-it is paid, in fact, to the Oklahoma Tax Commission rather than to any state health agency that might be able to confer a smoking-related benefit. The consumer who ultimately bears the costs of the assessment is paying the retailer consideration in exchange for a pack of cigarettes, rather than the government in exchange for healthcare for his smoking-related illnesses. The consumer may never need such healthcare, may not qualify for any state provided healthcare, and even if qualified may not take advantage of that healthcare. And even if the consumer does, he might cost the State a lot of money, or very little, but the amount he paid through this "fee" remains the same. There is no direct nexus between the assessment and any particular government benefit to be conferred in exchange. Thus, the assessment has all the hallmarks of a tax, "where the special benefits derived from th[e] performance of the function is merged in the general benefit."

¶48 Nor can the assessment be considered a fee intended to cover the cost of administering a specific regulatory program. The $225 million is proportionate to the amount of revenue the Legislature needed to balance the budget rather than to the cost of administering the State's cigarette regulatory regime. And given that the new assessment will be administered through the State's existing cigarette excise tax stamp system, the administration of the new assessment will come at minimal cost to the State. Nor can the broad cost of the "toll that smoking has taken on the health of Oklahomans"[82] be used to justify the assessment as a "fee" because that is merely one of the generalized costs of administering state government, rather than any specific cost associated with regulation of the tobacco industry. And in any event, the overwhelming majority of the revenues generated by the assessment are not actually directed to compensating the State for smoking-related costs, but rather to the general support of health agencies.

¶49 Lastly, were we to hold otherwise, the distinction between fees and taxes-and thus the protections against taxation provided by Article V, Section 33-would be meaningless. The State Respondents tell us that this is a common refrain from those raising such challenges, and one we should thus ignore. But despite any prior false alarms, this cry of "wolf!" rings true. If this quintessential excise tax can be transformed into a fee merely by calling it a fee and adding some regulatory gloss to the measure enacting it, then the promise of Article V, Section 33-a promise made to citizens in 1992 when they went to the polls and enacted the amended version-will be an empty one. The "tax relief" to be expected from the requirement that all "future bills 'intended to raise revenue' . . . be approved by either a vote of the people or a three-fourths majority in both houses of the Legislature"[83] will have been illusory. And that, we think, would be an abject failure to carry out "the manifest purpose of the framers and the people who adopted it."[84]

D.

¶50 SB 845 contains several provisions that are not revenue raising in effect, so we must determine whether those provisions are "inseparably connected with and so dependent upon" the revenue raising portions such that "the surviving provisions would not have otherwise been enacted."[85] Here, Sections 1, 3, 4, 5, and 6 of SB 845 are not dependent on the revenue-related sections and can exist independently of those sections. And we take State Respondents' claims regarding the importance of the regulatory purposes advanced by the non-revenue-related sections as strong evidence that the Legislature would have "otherwise enacted" those regulatory provisions. We thus sever from SB 845 the revenue-related provisions contained in Sections 2, 7, 8, and 9, but leave the remainder of the measure intact.

* * *

¶51 For these reasons, we assume original jurisdiction and grant Petitioners' request for declaratory relief. Sections 2, 7, 8, and 9 of SB 845 were enacted in violation of Article V, Section 33 of the Oklahoma Constitution and are therefore invalid.

¶52 Any petition for rehearing shall be filed no later than the 17th day of August, 2017. If no petition for rehearing is filed by that deadline, this opinion shall be final.

ORIGINAL JURISDICTION ASSUMED. 
DECLARATORY RELIEF GRANTED. 
SECTIONS 2, 7, 8, AND 9 OF SB 845 ARE UNCONSTITUTIONAL.

Combs, C.J., Gurich, V.C.J., Kauger, Winchester, Edmondson, Reif, and Wyrick, JJ., concur.

Watt and Colbert, JJ., concur in part and dissent in part.

FOOTNOTES

[1] Okla. Const. art. V, § 33(A)-(B), (D). A measure can also be referred to the people for approval, but only if it originated in the House of Representatives. Id. § 33(C).

[2] Smoking Cessation and Prevention Act of 2017, SB 845, 56th Leg. (Okla.) [hereinafter "SB 845" or "the Act"].

[3] Pet'rs' App'x, Doc. 3, Gov. Mary Fallin, State of the State Address (Feb. 6, 2017); Pet'rs' App'x, Doc. 15D, H.R. Floor Debate on SB 845 at 5-6 (May 26, 2017) (statements of House Minority Leader, Rep. Scott Inman); Barbara Hoberock, House Republicans and Democrats Strike Revenue-Raising Deal, House Speaker Says, Tulsa World, May 11, 2017, http://www.tulsaworld.com/ news/capitol_report/house-republicans-and-democrats-strike-revenue-raising-deal-house-speaker /article_f536d5f3-2a17-5dab-bdbe-0c9f76056170.html (quoting Senate President Pro Tem, Sen. Mike Schulz, as saying that "[t]he Senate already has shown its willingness to approve revenue-raising measures"); Rep. Jadine Nollan, Editorial, Nollan's Notes: How to Fix the State's Budget in Three Easy Steps, Sand Springs Leader, Apr. 5, 2017, http://www.tulsaworld.com/ communities/sandsprings/nollan-s-notes-how-to-fix-the-state-s-budget/article_3da70822-b3e5-503b-a55a-d3a95a73fc4d.html (revealing the House Assistant Majority Whip's own thoughts about creating new revenue); Op-Ed, New Revenue Must Be Part of Budget Debate, Oklahoman, Mar. 26, 2017, at 14A ("Rep. Leslie Osborn, chairwoman of the Appropriations and Budget Committee, . . . . deserves credit for putting forward the tobacco tax bill, and for acknowledging that simply continuing to cut state agencies, as has been the norm the past three years, cannot be the default approach for lawmakers in her party."); Ben Felder, New Speaker Wants Early Focus on Budget, Oklahoman, Feb. 5, 2017, at 8A (quoting House Speaker Pro Tem, Rep. Harold Wright, as saying "[t]here will be some Republicans that will not vote for any type of tax increase and that's going to be a challenge for the speaker, . . . [b]ut I think there is a feeling this year that we need to do something to increase revenue because we've probably gone as deep as we can with some cuts").

[4] Pet'rs' App'x, Doc. 3, Gov. Mary Fallin, State of the State Address 2.

[5] Id. at 4.

[6] See HB 1841, 56th Leg. (Okla. 2017) (titled "An Act relating to health care funding" and stating that, "[i]n addition to the tax levied in Sections 302, 302-1, 302-2, 302-3, 302-4 and 302-5 of Title 68 of the Oklahoma Statutes, there is hereby levied upon the sale, use, gift, possession or consumption of cigarettes . . . a tax at the rate of One Dollar and fifty cents ($1.50) per pack of cigarettes"); HB 2365, 56th Leg. (Okla. 2017) (titled "An Act relating to revenue and taxation" and stating that, "[f]or the purpose of providing revenue for the support of the functions of state government . . . there is hereby levied upon the sale, use, gift, possession or consumption of cigarettes . . . a tax at the rate of seventy-five (75) mills per cigarette"); HB 2372, 56th Leg. (Okla. 2017) (titled "An Act relating to revenue and taxation" and stating that, "[f]or the purpose of providing revenue for the support of the functions of state government . . . there is hereby levied upon the sale, use, gift, possession or consumption of cigarettes . . . a tax at the rate of seventy-five (75) mills per cigarette"); HB 2414, 56th Leg. (Okla. 2017) (titled "An Act relating to revenue and taxation" and stating that, "[f]or the purpose of providing revenue for the support of the functions of state government . . . there is hereby levied upon the sale, use, gift, possession or consumption of cigarettes . . . a tax at the rate of seventy-five (75) mills per cigarette").

[7] SB 845 achieves this through creation of a new "Health Care Enhancement Fund," which is described as "a continuing fund, not subject to fiscal year limitations," that "shall consist of monies received pursuant to . . . this act and any monies designated to the fund by law," with all monies to be "appropriated at the discretion of the Legislature for the purpose of enhancing the health of Oklahomans." SB 845, § 8.

[8] The Fiscal Impact Statement prepared for the Legislature by the Oklahoma Tax Commission estimated that SB 845 would generate $257,841,000 in new revenues in fiscal year 2018, but it based that estimate on the assumption that the measure would go into effect immediately due to its emergency effective date. Pet'rs' App'x, Doc. 12, Okla. Tax Comm'n, Estimated FY18 Fiscal Impact Statement for SB 845 at 1 (May 23, 2017). The emergency effective date, however, was not part of the final measure; so the estimated revenue for fiscal year 2018 is now $225,263,158. Pet'rs' Supp. App'x, Doc. 21, State Bd. of Equalization, Proposed FY-2018 Revenue Certification 8 (June 28, 2017).

[9] HB 2365, § 1(A); HB 2372, § 1(A); HB 2414, § 1(A).

[10] HB 1841.

[11] See generally Okla. Const. art. X, §§ 23, 25.

[12] Pet'rs' App'x, Doc. 15C, H.R. Floor Debate on SB 860 at 1-2 (May 26, 2017) (Chairwoman of the House's Appropriations and Budget Committee acknowledging that the proposed budget assumed collection of the revenues expected from the cigarette assessment and that the balanced budget problem would be "fix[ed]" by approval of SB 845); see also Okla. Const. art. X, § 23(2) (mandating that "[a]ll appropriations made in excess of [the amount certified by the State Board of Equalization as available for appropriation] shall be null and void; provided, however, that the Legislature may at any regular session or special session, called for that purpose, enact laws to provide for additional revenues or a reduction in revenues, other than ad valorem taxes, or transferring the existing revenues or unappropriated cash on hand from one fund to another, or making provisions for appropriating funds not previously appropriated directly by the Legislature.").

[13] Pet'rs' App'x, Doc. 15D, H.R. Floor Debate on SB 845 at 1-2; see also id. at 8 (Chairwoman of the House's Appropriations and Budget Committee, advocating for votes in favor of SB 845 because "we have voted for a constitutionally mandated balanced budget but it was predicated on voting green on this bill. So I am asking you, I am pleading with you, if you manned up and put a green on the board for the budget, please put a green on the board for this").

[14] Although "it is the rare case that will be entertained on original jurisdiction that requests declaratory relief," this case presents an issue that both concerns the public interest and calls for a prompt decision, due to the impending effective date of the challenged measure. Edmondson v. Pearce, 2004 OK 23, ¶ 11, 91 P.3d 605, 614. And while we have previously held that we have the power to issue injunctive relief in support of our decisions in original actions (and a permanent injunction, rather than a writ of prohibition, would be the appropriate injunctive remedy in a case like this), see, e.g., State ex rel. Trapp v. Chambers, 1923 OK 943, ¶ 0, 220 P. 890, 891, we do not believe injunctive relief is necessary to effectuate our judgment here.

[15] Okla. Const. art. V, § 36 ("The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever.").

[16] Calvey v. Daxon, 2000 OK 17, ¶ 21, 997 P.2d 164, 171.

[17] Okla. Const. art. V, § 33 (1907, amended 1992).

[18] State Question 640 (as proposed by Sec'y of State, Oct. 30, 1991), available at https://www.sos.ok.gov/ documents/questions/640.pdf.

[19] John Greiner, Mick Hinton, & Paul English, Most Legislators Take Stand Against SQ 640, Oklahoman, Feb. 23, 1992, at 1 (survey showing that legislators of the day generally opposed allowing the people to vote on "future state tax hikes").

[20] See, e.g., John Greiner, SQ 640 Voters Yank Tax Rein, Oklahoman, Mar. 11, 1992, at 1 ("The approval makes Oklahoma one of the most restrictive states on tax hikes."); John Parker, SQ 640 Shortfalls Predicted, Oklahoman, Feb. 26, 1992, at 15 (quoting then-budget director Paul Shinn as stating that Question 640, "if passed, would curb legislators' ability to pass tax increases").

[21] Pet'rs' App'x, Doc. 2, Ark. Bureau of Legis. Research, Rep. No. 05-101, A Summary of Legislative Supermajority Requirements 2 (Nov. 1, 2005).

[22] See Okla. Const. art. X, §§ 23, 25.

[23] Id. § 23.

[24] See id. § 23(1).

[25] See id. § 23(2).

[26] Id. § 23(9).

[27] Id. § 23(2).

[28] Id. § 23(7).

[29] Id. § 23(10).

[30] 1908 OK 250, ¶ 11, 98 P. 1002, 1006 (quoting In re The Nashville, 17 F. Cas. 1176 (D. Ind. 1868)), overruled on other grounds by Fent v. Fallin, 2014 OK 105, ¶¶ 7, 17-18, 345 P.3d 1113, 1115-16, 1118 (overruling dicta in ¶ 14 of the Anderson opinion that suggested the definition of "raising revenue" might include bills resulting in a decrease of revenue).

[31] Pure Oil Co. v. Okla. Tax Comm'n, 1936 OK 516, ¶ 10, 66 P.2d 1097, 1100 (quoting Ex parte Tindall, 1924 OK 669, ¶ 0, 229 P. 125, 127).

[32] Fent, 2014 OK 105, ¶ 17, 345 P.3d at 1117-18.

[33] Id. ¶¶ 12-13, 345 P.3d at 1117. This is so because the legitimacy of any constitution--or any written instrument in the nature of a contract--is derived primarily from the consent of those agreeing to be bound by it. See 1 Joseph Story, Commentaries on the Constitution of the United States §§ 399-400, at 383 (1833) ("[We] endeavour to ascertain, what are the true rules of interpretation applicable to the constitution; so that we may have some fixed standard, by which to measure its powers, and limit its prohibitions, and guard its obligations, and enforce its securities of our rights and liberties. . . . The first and fundamental rule in the interpretation of all instruments is, to construe them according to the sense of the terms, and the intention of the parties." (emphasis added)).

[34] Fent, 2014 OK 105, ¶ 12, 345 P.3d at 1117.

[35] Id. ¶ 17.

[36] Id. ¶ 13.

[37] Id. ¶ 14.

[38] Id. (emphasis added); see also id. ¶ 15 (stating that "one of the overriding purposes of the 1992 amendment to art. V, § 33 was to secure 'tax relief.'"); Anderson, 1908 OK 250, ¶ 10, 98 P. at 1006 (similarly recognizing that art. V, § 33 in its original form was aimed at laws that "impose a burden on taxpayers . . . and was intended to protect taxpayers.").

[39] Anderson, 1908 OK 250, ¶ 11, 98 P. at 1006; accord Leveridge v. Okla. Tax Comm'n, 1956 OK 77, ¶ 8, 294 P.2d 809, 811.

[40] Torres v. Seaboard Foods, LLC, 2016 OK 20, ¶ 21, 373 P.3d 1057, 1068 (holding that "a court's constitutional analysis must be based upon what the legislation actually accomplishes by that which is created by the statute, and not by what a legislatures states it is accomplishing.").

[41] This isn't to say that context is irrelevant. In re Estate of Little Bear, 1995 OK 134, ¶ 22, 909 P.2d 42, 50 (recognizing that statutes "must be interpreted in light of their context."). To recognize there is a constitutional mandate to balance the budget and that the budget would be out of balance but for SB 845 (due to the passage of the general appropriations bill appropriating the revenues expected from SB 845) is merely to recognize the state of the law at the time of enactment, which is an objective fact lacking in the subjectivity that makes statements of legislators unreliable as indicators of purpose. See Fulsom v. Fulsom, 2003 OK 96, ¶ 8, 81 P.3d 652, 655 (noting that statutes cannot be read in a vacuum, but rather must be understood "in light of the law in effect at the time of [their] enactment.").

[42] Section 2 also directs that "[a]ny revenue collected pursuant" to SB 845 "be subject to the rebate provisions of state-tribal compacts relating to tobaccos sales." Those state-tribal compacts are, of course, the "Tobacco Tax Compacts" that govern the sharing of revenues derived from excise taxes on cigarettes, and which contain no provisions governing the sharing of "fees." See, e.g., Tobacco Tax Compact, Okla.-Choctaw Nation of Okla., art. II(1), Nov. 3, 2013, available at https://www.sos.ok.gov/documents/filelog/89578.pdf ("The provisions of this Compact shall govern the rate of taxation and payment of taxes to the Nation and the State on the retail sales of cigarettes and other tobacco products in the Nation's Indian Country . . . ."); id. art. II(7)(d) ("From January 1, 2018 through December 31, 2023 . . . [t]he State shall receive fifty percent (50%) of all Compact Taxes collected on cigarettes that are subject to this Compact . . . . [and t]he Tribe shall receive fifty percent (50%) of all Compact taxes collected on cigarettes that are subject to this compact); Tobacco Tax Compact, Okla.-Cherokee Nation, art. II, Nov. 18, 2013, available at https://www.sos.ok.gov/documents/filelog/89635.pdf (same); First Amended Tobacco Tax Compact, Okla.-Muscogee (Creek) Nation of Okla., art. II, Aug. 27, 2014, available at https://www.sos.ok.gov/documents/filelog/90156.pdf (same).

[43] 63 O.S. §§ 1-1521 et seq.

[44] Exec. Order 2012-01, Okla. Admin. Code 1:2012-1.

[45] Pet'rs' App'x, Doc. 12, Okla. Tax Comm'n, Estimated FY18 Fiscal Impact Statement for SB 845 at 1 (May 23, 2017).

[46] SB 845's title, which we consider relevant in our inquiry into legislative purpose, Fent, 2014 OK 105, ¶ 8, 345 P.3d at 1116, describes the bill as "[a]n Act relating to public health" and describes a mixture of provisions, some related to regulation of tobacco use, and others related to revenue and revenue collection and apportionment. Nothing in the title adds to the analysis, as the title merely provides short descriptions of each section of the measure.

[47] Torres, 2016 OK 20, ¶ 21, 373 P.3d at 1068; see also Olustee Co-op. Ass'n v. Okla. Wheat Utilization Research & Mkt. Dev. Comm'n, 1964 OK 81, ¶ 9, 391 P.2d 216, 218 ("The question whether a particular contribution, charge, or burden is to be regarded as a tax depends on its real nature, and, if it is in its nature a tax, it is not material that it may be called by a different name." (quoting 84 C.J.S. Taxation § 1 ¶ b, at 34)).

[48] SB 845, § 7(A) ("Increasing the price point of cigarettes is the single most effective strategy to reduce cigarette consumption by deterring children and adolescents from taking up smoking, by reducing the overall consumption of cigarettes by an estimated 26,000,000 cigarette packs in the first year, by reducing the prevalence of adult smoking by an estimated five percent (5%), by preventing an estimated 28,000 kids today from becoming adult smokers, and by reducing health-related disparities among income groups over time.").

[49] Anderson, 1908 OK 250, ¶ 10, 98 P. at 1006.

[50] Pet'rs' Supp. App'x, Doc. 21, State Bd. of Equalization, Proposed FY-2018 Revenue Certification 1, 8 (June 28, 2017).

[51] Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 567 (2012) (quoting Sonzinsky v. United States, 300 U.S. 506, 513 (1937)) (recognizing that "[e]very tax is in some measure regulatory," including cigarette taxes).

[52] SB 845, § 7(C); see also SB 860, 56th Leg. § 77 (Okla. 2017) (appropriating $70 million out of the Health Care Enhancement Fund created by SB 845 to the Oklahoma Healthcare Authority); id. § 83 (appropriating $75 million to the Department of Mental Health and Substance Abuse Services); id. § 93 (appropriating $69 million to the Department of Human Services). The State Respondents' claim that the revenues are merely compensatory is also undercut by the existence of the State's Master Settlement Agreement, which resolved the State's claims against a host of tobacco companies and released all future claims for smoking-related health costs, and which has resulted in the State receiving some $1.4 billion in compensation from those tobacco companies for the harms caused by their products. Pet'rs' Reply Br. 9.

[53] This conclusion is bolstered by SB 845's lack of any mechanism to directly enforce the collection of the fee from the consumer. If, as the State Respondents claim, the driving force behind the measure is to force consumers to pay more for each pack so that they will smoke less, one would expect that the measure would contain a mechanism to directly enforce consumer compliance--penalties for failure to pay, etc. But instead Section 9 provides only that the Oklahoma Tax Commission should take steps to ensure that it gets paid by the wholesalers--a familiar measure in the tax code that places the burden to remit the collected revenues to the State on the wholesaler, even if the wholesaler has failed in its attempts to collect the revenue from the retailer or consumer. See 68 O.S. § 305(A). What Section 9 indicates is that the Legislature was first and primarily concerned with getting its money, regardless of who paid it.

[54] Ex parte Tindall, 1924 OK 669, ¶ 0, 229 P. 125, 127 (holding that a bill imposing a licensing fee on certain commercial carriers was not a revenue bill because "such fee or tax [was] merely incidental to the enforcement of the real purpose of the act," which was to regulate the use of state highways).

[55] Under State Respondents' theory of the case, a so-called "sin tax" could never be a "revenue raising measure" because such a tax is always imposed with a purpose of reducing the incidence of the harmful behavior.

[56] See Olustee Co-op. Ass'n, 1964 OK 81, ¶ 8, 391 P.2d at 218 (defining a "tax" as "a forced burden, charge, exaction, imposition, or contribution assessed in accordance with some reasonable rule of apportionment by authority of a sovereign state upon the persons or property within its jurisdiction, to provide public revenue for the support of the government, the administration of the law, or the payment of public expenses"); see also Fent, 2014 OK 105, ¶ 6, 345 P.3d at 1115 (recognizing that revenue bills include "bills which impose taxes upon the people, either directly or indirectly, or lay duties, imposts, or excises for the use of government.").

[57] Black's Law Dictionary 1471 (7th ed. 1999) (defining a "sin tax" as "[a]n excise tax imposed on goods or activities that are considered harmful or immoral (such as cigarettes, liquor, or gambling).").

[58] See Pet'rs' Supp. App'x, Doc. 21, State Bd. of Equalization, Proposed FY-2018 Revenue Certification 1, 8 (June 28, 2017) (relying on the $225 million generated by SB 845 to make that certification).

[59] 1917 OK 458, 168 P. 53.

[60] Id. ¶ 32, 168 P. at 57.

[61] Resp'ts' Br. 8.

[62] In re Lee, 1917 OK 458, ¶¶ 8-21, 168 P. at 54-56.

[63] 1914 OK CR 154, 148 P. 1061.

[64] Id. at 1068.

[65] The State Respondents argue that "the [f]ee is imposed on a particular industry (tobacco) that profits from Oklahomans' use of its product." Resp'ts' Br. 15. This is not true. The fee is not imposed on manufacturers of cigarettes, but rather on wholesalers of cigarettes with the intent that the cost be passed on to the customers. This distinguishes the assessment from the regulatory fees imposed in the cases relied on by State Respondents.

[66] See id. at 8-10 (citing In re Application of Okla. Capitol Improvement Auth., 1998 OK 25, 958 P.2d 759; Pure Oil Co. v. Okla. Tax Comm'n, 1936 OK 516, 66 P.2d 1097; Ex parte Tindall, 1924 OK 669, 229 P. 125; Ex parte Sales, 1924 OK 668, 233 P.186).

[67] Ex parte Sales, 1924 OK 668, ¶ 7, 233 P. at 187.

[68] The State Respondents' reliance on our decision in In re Application of Oklahoma Capitol Improvement Authority, 1998 OK 25, 958 P.2d 759, is misplaced--and puzzling. That case didn't involve any measure levying a tax or fee, but rather a measure authorizing the issuance of new bonds that would be repaid with revenues from various already-in-place fees and taxes. That is why those challenging the measure did not bring a claim under Article V, Section 33, and why we pointed out in a footnote that Section 33 was inapplicable. Id. ¶ 3 n.5, 958 P.2d at 762 n.5.

[69] Resp'ts' Br. 5.

[70] GenOn Mid-Atl., LLC v. Montgomery County, Maryland, 650 F.3d 1021, 1023 (4th Cir. 2011) (internal quotation marks omitted).

[71] Red Slipper Club, Inc. v. City of Oklahoma City, 1979 OK 118, ¶ 4, 599 P.2d 406, 408.

[72] See Oklahoma Cigarette Stamp Tax, ch. 66, art. 8, § 4, 1935 O.S.L. 315, 315 (repealed 1937); Oklahoma Cigarette Stamp Tax Act, ch. 66, art. 7, § 4, 1937 O.S.L. 426, 427 (repealed 1939); Act of May 31, 1939, ch. 66, art. 18, § 2, 1939 O.S.L. 500, 501-02 (amended 1941); 68 O.S.1941 § 586a (amended 1953) (originally enacted as Act of May 15, 1941, tit. 68, ch. 16, § 2, 1941 O.S.L. 339, 340); Act of June 10, 1953, ch. 16, § 1, 1953 O.S.L. 326, 326 (amended 1961); 68 O.S.1961 § 586a (repealed 1965) (originally enacted as Act of May 24, 1961, tit. 68, ch. 16, § 1, 1961 O.S.L. 506, 506-07); 68 O.S. § 302 (originally enacted as Cigarette Stamp Tax Law, ch. 195, sec. 2, § 302, 1965 O.S.L. 342, 344-45); 68 O.S. § 302-1 (originally enacted as Act of March 15, 1968, ch. 47, § 1, 1968 O.S.L. 58); 68 O.S. § 302-2 (originally enacted as Act of May 24, 1979, ch. 195, § 5, 1979 O.S.L. 488, 498); 68 O.S. § 302-3 (originally enacted as Act of June 21, 1985, ch. 179, § 72, 1985 O.S.L. 588, 656); 68 O.S. § 302-4 (originally enacted as Act of May 26, 1987, ch. 113, § 5, 1987 O.S.L. 427, 432); 68 O.S. § 302-5 (originally proposed as State Question 713, approved by the people Nov. 2, 2004, and enacted at ch. 322, § 2, 2004 O.S.L. 1429, 1430).

[73] See 68 O.S. §§ 302 to 302-5.

[74] 68 O.S. § 303.

[75] See State Question 713 (as proposed by Sec'y of State, June 10, 2004) (codified at 68 O.S.2011 § 302-5 & amended 2008), available at https://www.sos.ok.gov/ documents/questions/713.pdf.

[76] See supra note 6 and accompanying text.

[77] Black's Law Dictionary 1471 (7th ed. 1999).

[78] See Olustee Co-op. Ass'n, 1964 OK 81, ¶ 8, 391 P.2d at 218 (citing 51 Am. Jur. Taxation § 3, at 35-38).

[79] See In re Lee, 1917 OK 458, ¶ 32, 168 P. at 57 (distinguishing a fee from a tax on the basis that a fee is designed to compensate the government whereas a tax is designed to raise revenue); see also Red Slipper Club, Inc., 1979 OK 118, ¶¶ 2-5, 599 P.2d at 408-09 (explaining the general rule that fees should be closely tied to the cost of the service for which they are imposed).

[80] Olustee Co-op Ass'n, 1964 OK 81, ¶ 8, 391 P.2d at 218 (concluding that a per-bushel "fee" imposed on wheat growers was instead a tax).

[81] Id.

[82] Resp'ts' Br. 15.

[83] Fent, 2014 OK 105, ¶ 14, 345 P.3d at 1117.

[84] Id. ¶ 17, 345 P.3d at 1117.

[85] Fent v. Contingency Review Bd., 2007 OK 27, ¶ 18, 163 P.3d 512, 523.






 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1914 OK CR 154, 148 P. 1061, 11 Okl.Cr. 449, Ex parte Ambler
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1936 OK 516, 66 P.2d 1097, 179 Okla. 479, PURE OIL CO. v. OKLAHOMA TAX COMM'N
Discussed at Length
 1956 OK 77, 294 P.2d 809, LEVERIDGE v. OKLAHOMA TAX COMMISSION
Discussed
 1917 OK 458, 168 P. 53, 64 Okla. 310, In re LEE
Discussed at Length
 1908 OK 250, 98 P. 1002, 22 Okla. 761, ANDERSON v. RITTERBUSCH
Discussed at Length
 1964 OK 81, 391 P.2d 216, OLUSTEE CO-OP. ASS'N v. OKLA. WHEAT U.R. & M.D.C.
Discussed at Length
 1923 OK 943, 220 P. 890, 96 Okla. 78, STATE ex rel. TRAPP
Discussed
 1995 OK 134, 909 P.2d 42, 66 OBJ 3827, In the Matter of the Estate of Little Bear
Discussed
 2003 OK 96, 81 P.3d 652, FULSOM v. FULSOM
Discussed
 2004 OK 23, 91 P.3d 605, EDMONDSON v. PEARCE
Discussed
 2007 OK 27, 163 P.3d 512, FENT v. CONTINGENCY REVIEW BOARD
Discussed
 1924 OK 668, 233 P. 186, 108 Okla. 29, Ex parte SALES
Discussed
 1924 OK 669, 229 P. 125, 102 Okla. 192, Ex parte TINDALL
Discussed at Length
 2014 OK 105, 345 P.3d 1113, FENT v. FALLIN
Discussed at Length
 2016 OK 20, 373 P.3d 1057, TORRES v. SEABOARD FOODS, LLC
Discussed at Length
 1979 OK 118, 599 P.2d 406, RED SLIPPER CLUB v. CITY OF OKLAHOMA CITY
Discussed at Length
 2000 OK 17, 997 P.2d 164, 71 OBJ 721, Calvey v. Daxon
Discussed
 1998 OK 25, 958 P.2d 759, 69 OBJ 1183, In Re: OKLAHOMA CAPITOL IMPROVEMENT
Discussed at Length
Title 63. Public Health and Safety
 Cite
Name
Level

 63 O.S. 1-1521, Short Title
Cited
 63 O.S. 1-1525, Owner Prevention of Smoking in Nonsmoking Areas
Cited
 63 O.S. 1-1528, Dangers of Smoking in Motor Vehicles Where Children are Present
Cited
 63 O.S. 1-1529, Prohibited Smoking Locations and Exemptions
Cited
 63 O.S. 1-1530, Prevention of Tobacco Use by Minors
Cited
 63 O.S. 1-1531, Smoking Cessation Fee on Wholesale Sale of Cigarettes
Cited
 63 O.S. 1-1532, Creation of Health Card Enhancement Fund
Cited
Title 68. Revenue and Taxation
 Cite
Name
Level

 68 O.S. 302-5, Additional Tax on Sale, Use, Gift, Possession, or Consumption of Cigarettes - Rate - Apportionment
Cited
 68 O.S. 303, Purpose of Tax - Disposition of Revenue
Cited
 68 O.S. 305, Stamps Required
Cited